PITTSBURGH PRESS CLUB,
Plaintiff-Appellee,

v.

UNITED STATES of America,
Defendant-Appellant.

No. 77–1721.

United States Court of Appeals,
Third Circuit.

Argued Feb. 15, 1978.

Decided April 24, 1978.

Leonard M. Mendelson, T. Lawrence Palmer, Hollinshead & Mendelson, Pittsburgh, Pa., for plaintiff-appellee.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Leonard J. Henzke, Jr., Robert T. Duffy, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant; Blair A. Griffith, U. S. Atty., Thomas A. Daley, Asst. U. S. Atty., Pittsburgh, Pa., of counsel.

Before SEITZ, Chief Judge, and ROSENN and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

This case, involving the Pittsburgh Press Club's action for an income tax refund, comes before us for the second time. Because crucial findings of fact made by the district court were based on inadmissible evidence, we must once again reverse.

### I

The Pittsburgh Press Club (PPC or the Club), organized in 1885 under the laws of Pennsylvania, and reactivated in 1955, ap-

plied in 1956 for a federal income tax exemption as a social club. In 1959 the Internal Revenue Service (IRS) granted the exemption pursuant to IRC § 501(c)(7), which exempts from federal income taxation:

> Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder.

In its application for tax exemption, the Club stated that its purpose was:

> To provide a professional and social meeting place for those engaged in news and advertising work on newspapers, magazines, radio and television and in public relations activities for the furtherance of common interests.[1]

In 1964 IRS examined PPC's books and records for fiscal year 1962, and determined that "outside" groups (i.e., nonmember groups) had been permitted to use the Club's facilities twelve times during that fiscal year. IRS did not then challenge PPC's exempt status, but warned the Club's officers that continued use by outside groups jeopardized PPC's exemption. PPC responded by a letter stating that nonmember use of its facilities would be discontinued.

In 1970 an IRS agent conducted an extensive audit of the Club for fiscal years 1967, 1968 and 1969. He determined that during the period of these three years more than 800 functions had been held by non-member outside groups, although each such group had been member sponsored.[2] Based on these findings the agent further determined the amount of "outside" revenues for the three years in question, as well as the percentage those revenues were of the Club's gross receipts (defined to exclude receipts from initiation fees). These determinations were:

| Fiscal Year | Outside Revenue | Percentage of Gross Receipts |
|---|---|---|
| 1967 | $ 62,311 | 11.18% |
| 1968 | 101,472 | 16.31% |
| 1969 | 118,130 | 17.43% |

On February 1, 1972, IRS revoked the Club's exempt status as of fiscal year 1967, and assessed income taxes for fiscal years 1967 through 1971. The taxes so assessed were paid under protest. IRS's revocation of PPC's exempt status was based on two factors. First, observing that voting members paid lower dues than the other classes of members (associate or affiliate members), IRS concluded that the differential in dues constituted an inurement of net earnings to the benefit of the voting members, who were considered by IRS to be private shareholders. IRS charged that this practice violated IRC § 501(c)(7). *See generally* Rev.Rul. 70–48, 1970–1 C.B. 133. Second, IRS claimed that PPC's continued practice of permitting its facilities to be used for outside affairs, resulting in PPC's receiving substantial revenues from these outside sources, constituted engaging in business. Thus, it charged that the Club was not

---

1. Also, see PPC's Constitution and By Laws, Article II:

   *Purpose*

   The purpose of the Club is to bring together in closer friendship members of the news and related professions, to provide and maintain clubrooms and facilities, to promote the interests of the professions and their members, and to afford members a means of assembling for discussion of common professional problems.

2. Such use would constitute use by the "general public", which was defined in Rev.Proc. 64–36, 1964–2 C.B. 962, § 3.03, to include outside organizations or groups which use an exempt social club's facilities through member-sponsorship. An affair, although it includes nonmembers, will not be characterized an "outside use" if it involves a bona fide guest-host rela-

tionship (i.e., where the sponsoring member pays for his guests, or where the group using the facilities is composed of 75% or more Club members). Rev.Proc. 71–17, 1971–1 C.B. 683, which became effective on July 1, 1971 and which superseded Rev.Proc. 64–36, 1964–2 C.B. 962, § 4, specifies the same criteria. Additionally, it added a presumption that a genuine guest-host relationship is present if the group is eight or less, of whom at least one is a member. If an employer of a member pays the bill, the function is classified as "inside" (and therefore not endangering exempt status), provided the function relates to the member-employee's duties or it serves a direct business objective of the member-employee. If the use of the facilities is unrelated to the member-employee's duties, the function is classified as "outside". See Rev.Proc. 71–17, § 4.03.

being operated exclusively for nonprofit purposes, and was therefore in violation of IRC § 501(c)(7). *See generally* Treas.Reg. § 1501(c)(7)–1(b); Rev.Rul. 60–324, 1960–2 C.B. 173.

PPC brought suit in the district court for a refund of the taxes which it had paid. IRS counterclaimed for interest which had accrued prior to payment. The district court ruled in the Club's favor on both issues. 388 F.Supp. 1269 (W.D.Pa.1975).

On appeal (at No. 75–1757) this court upheld the district court's ruling that the differential dues scale did not violate the "inurement of net earnings" provision of IRC § 501(c)(7). 536 F.2d 572, 574 (3d Cir. 1976). With respect to the nonmember revenue issue, however, this court remanded for more specific findings,[3] "including the percentage of gross receipts from nonmembers disclosed by the record." *Id.* at 575 (footnote omitted).[4] The court also directed that the district court make findings respecting other relevant factors, such as the amount of "outside" business, net profits derived from nonmembers, the purpose for which PPC's facilities were made available to nonmember groups, and the frequency of such use. *Id.*

On remand the district court (426 F.Supp. 553 (W.D.Pa.1977)) reopened the record over IRS's objection to allow PPC to present additional evidence. The Club's new evidence consisted principally of a survey (the "second survey") and of expert testimony by an economist (Dr. Kenkel) and by PPC's accountant. The second "survey" was comprised of mailings to the member-sponsors of 690 of the 815 challenged affairs (the addresses of 125 member-sponsors could not be located). This survey resulted in 281 usable responses. Based on extrapolations from these responses, Dr. Kenkel concluded that outside revenue for the three audited years was between $41,502 and $83,004, or two to four percent of total income. Using these figures, the Club's accountants then determined that the net profit attributable to "outside business" was $150 in fiscal 1967 and $72 in fiscal 1968.[5] The accountants also concluded that no profit was realized for the following three fiscal years because total banquet operations had resulted in a net loss to the Club for those years.

Based on the new exhibits and testimony, the district court again found in favor of PPC. Its specific findings of fact were as follows:

(1) the amount of outside business is not more than $83,004;

(2) the percentage of outside business is not more than 4%, and may be nearer 2%;

(3) the amount of net profits from outside business is negligible or de minimis;

(4) the purpose of events at which the club facilities are used by outsiders are principally social events such as wedding or bar mitzvah receptions, and business-

3. We held that the figures and percentages of gross revenues alleged by the Government were not as a matter of law dispositive of the question of the availability of the exemption. 536 F.2d at 575–76.

4. At trial, PPC had disputed IRS's percentages, primarily on the basis of a survey (the "first survey") which consisted of questionnaires sent to the members who had sponsored twenty-five challenged affairs. Those affairs had generated the largest revenues of all the challenged affairs in fiscal 1969. Based on twenty responses, PPC's accountants had made an extrapolation which purportedly demonstrated that outside revenues constituted only two to four percent of gross receipts. The district court made no express finding as to the relevant percentages, but indicated its inclination to accept the Club's percentage data rather than that of IRS. 388 F.Supp. at 1276. On appeal this court expressed "no opinion on the evidentiary value of the [first] survey." 536 F.2d at 576 n.11. Instead, we left "that question for the district court to resolve . . . in the first instance." *Id.*

5. In calculating the net profit, the accountants allocated both fixed and variable costs to its banquet activities. Fixed expenses such as rent, insurance, utilities and maintenance were allocated against the Club's banquet income on a square-foot basis (*i. e.*, percentage banquet room square footage is to total square footage). Certain other variable costs—such as cost of goods, wages and salaries, depreciation, taxes, supplies—were allocated against banquet income on the basis of sales. This method of calculation is discussed in Part III of this opinion, *infra.*

oriented gatherings for sales presentations and the like, in connection with the trade, profession, or business of the sponsoring member;

(5) the frequency of such events is no more than normal in a club of plaintiff's size, 3550 banquet department events having been held in the years 1967–1971 (PX C–1), of which only 815 were questioned by the IRS, and of these not over 245 were found to be outside business.

426 F.Supp. at 555–56. This appeal by IRS followed.

## II

### A

IRS initially objected to the district court's decision which permitted PPC to introduce new evidence after remand. On appeal, IRS at first contended that when this court remanded to the district court for more specific findings, we had precluded the reopening of the record or the adducing of additional evidence by our direction that "[t]he district court should make more specific findings on remand, including the percentages of gross receipts from nonmembers *disclosed by the record*," 536 F.2d at 575 (emphasis added). IRS also singled out our directive that "[o]n remand, the district court should make more specific findings on all relevant factors, including findings on the amount of 'outside business' of the taxpayer *revealed in the record* . . . ," *id.* at 576 (emphasis added). This language, according to IRS, indicated a narrow mandate requiring that the district court refer only to the then existing record in making its new findings. IRS argued that in reopening the record the district court exceeded the scope of our mandate. We do not agree.

▮ This court's language in the decision at No. 75–1757 cannot be read to have the restrictive effect claimed by IRS. Whether a trial court will reopen the proceedings on remand is, of course, a matter for its sound discretion. In *Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891 (3d Cir. 1975), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976), this court enumerated the criteria with which a district court should be concerned in the exercise of that discretion. We noted that the district court should consider several factors: (1) what burden that would be placed on the parties and witnesses by additional proceedings; (2) what "undue prejudice" may result by not taking new testimony; and (3) whether judicial time and resources would be unnecessarily drained. 527 F.2d at 894, n.6.

▮ In the case *sub judice*, IRS pointed to no specific burdens placed upon it or its witnesses as a result of reopening the record at the second trial. At the same time, the prejudice to PPC had not been permitted to adduce further evidence was apparent, since PPC had the burden of demonstrating its entitlement to an exemption. Moreover, the two days of trial time required to receive the new evidence cannot be said to have significantly or unnecessarily drawn upon judicial resources, at least where the additional testimony and exhibits had the potential of aiding in the resolution of difficult questions. We conclude, therefore, that the district court did not abuse its discretion by reopening the proceedings.[6]

### B

IRS vigorously asserts that PPC's second "survey" was nothing more than a compilation of hearsay, none of which was admissible under any exception to the hearsay rule of Fed.R.Evid. 802. We agree.

After our remand, the Club decided to undertake a new survey of those affairs which had been classified as "outside busi-

---

**6.** Indeed, in its reply brief IRS conceded that it was proper to reopen the record to receive evidence concerning net profits. As to certain other matters, such as percentage of gross receipts from nonmembers, and frequency and purpose of nonmember use, IRS contended that there was "plenty of evidence", and thus there was "no need to supplement the record with the post-remand questionnaire." Reply Brief at 12. It thus appears that IRS has more or less withdrawn its objection to the additional proceedings, except insofar as the record was reopened to receive PPC's second survey and the testimony based thereon.

ness" by IRS. The survey was prepared and taken with the assistance of Dr. James L. Kenkel, an economist and statistician, as well as with the assistance of the Club's attorneys and various of its employees. PPC mailed a questionnaire and covering letter (the entire text of which is set forth in the margin [7]) to the sponsors of 690 of

7. The covering letter reads:

Dear Member:

As you may know, the Pittsburgh Press Club has been engaged in a prolonged dispute with the Internal Revenue Service regarding the Club's status as an exempt organization. Part of that controversy has been favorably resolved by the rulings of the United States District Court here in Pittsburgh and the United States Court of Appeals for the Third Circuit.

As yet unresolved and sent back for further hearing in the District Court is that part of the dispute which deals with revenues resulting from certain parties, banquets, or meeting functions (hereinafter referred to as affairs) held from 1966 through 1971 in the Banquet and Meeting Room facilities of the Club.

The purpose of this letter is to seek your assistance in gathering information to enable the Press Club to obtain a refund of income taxes paid under protest for the years 1966 through 1971. The Club recognizes that considerable time has passed and that some of your recollections or records may be dimmed or imperfect. However, the Club only asks that you make your best effort to record your best recollections on the enclosed questionnaire.

The results of the survey will be used by our expert witnesses and lawyers to establish statistical opinions as to the character of the use of the Club.

The heart of the remaining dispute is this: The Internal Revenue Service contends that from 11 to 17 percent of the revenue generated by facilities of the Press Club resulted from affairs which were not held for the social or business purposes of Press Club members. The Club, to the contrary, contends that almost all of these affairs was [sic] hosted by a member for his own social or business purposes, and that any unrelated used of the facilities by the general public, except for acceptable civic purposes, was insubstantial.

The Internal Revenue Service classified the following functions as generating *tax exempt income* to the Press Club:

1. Affairs held and paid for by a member for his own social or business purposes.
2. Affairs held by a member which related to his business or employment and which were paid for directly or indirectly by the member's business or employer.
3. Affairs where at least 75% of the guests were members or members' spouses.
4. Affairs conducted for a public service, civic or charitable purpose.

On the other hand, the Internal Revenue Service classifies the following uses of Club facilities as generating *taxable income*:

1. Affairs sponsored by a member where the guests are required to reimburse their host member.
2. Affairs sponsored by a member where the member's business or employer reimburses the member and where the function bears no relation to the employee's business or employment.

Will you please answer the survey questions, sign the survey, and return it in the stamped envelope provided.

Thank you.

. . . . . . . . . . . . . . . . . . .

Secretary

The questionnaire reads:

PITTSBURGH PRESS CLUB
PARTIES, BANQUETS OR MEETINGS SURVEY

In the records of the Press Club you are listed as a host for a party, banquet or meeting on [date] for a total charge of [amount]. Please answer those of the following questions that are applicable to you, to the best of your present recollection, sign the survey below, and return the survey in the envelope provided.

1. Did you as a member of the Press Club host a party, banquet or meeting as indicated above?

Yes _____ No _____

2. (a) Was the party, banquet or meeting related to your business, profession or duties as an employee?

Yes _____ No _____

(b) Did your business, professional practice or employer reimburse you wholly or in part for the charges which you paid to the Club?

Yes _____ No _____

(c) Did you require any of your business guests to reimburse you wholly or in part for the charges which you paid to the Club?

Yes _____ No _____

3. (a) Was the party, banquet or meeting a social event for your personal guests?

Yes _____ No _____

(b) Did you require any of your social guests to reimburse you wholly or in part for the charges which you paid to the Club?

Yes _____ No _____

4. Was the party, banquet or meeting for a civic, charitable or public purpose?

Yes _____ No _____

5. Were at least seventy five percent (75%) of your guests either members or spouses of members?

Yes _____ No _____

. . . . . . . . . . . . . . . . . . . . . . . . . .

Member's Signature

the questioned functions.[8] The survey produced 281 usable responses, which Dr. Kenkel believed were reliable. Based upon these responses, he classified the particular affairs (all of which had been classified as outside by the IRS) as "clearly outside", "clearly inside", or "doubtful". Extrapolating from this data to the entire universe of 815 events, he concluded that the Club's *maximum* outside revenue (*i.e.*, including "doubtful" events) for the fiscal years 1967 through 1969 was $83,004 (as opposed to IRS's figure of $276,683.51), and that the Club's *minimum* outside income (*i.e.*, excluding "doubtful" events) for that period was $41,502. Comparing these estimates to PPC's total income for the three fiscal years in question, Dr. Kenkel determined that the Club's outside income for the three years was only two to four percent of its gross receipts (as contrasted with the 11% to 17% figures computed by IRS).

PPC's accountants next calculated the Club's net profit or loss from its total banquet business[9] for the tax years 1967 to 1971. They then applied Dr. Kenkel's percentages to derive net profit attributable to outside banquet business. They concluded that there was no net profit on outside business for fiscal years 1969 through 1971, since they had determined that in those three years the Club's total banquet business had produced a net loss. As for fiscal years 1967 and 1968, they calculated net profits on outside business as $150 and $72, respectively.

It is clear that PPC's second survey, which the district court admitted into evidence, was hearsay. The survey was no more than a summary and distillation of 281 extrajudicial declarations offered to prove the truth of the matters asserted in those declarations, *viz*, whether the banquets challenged by the IRS were "inside" or "outside" affairs. While some polls are not hearsay in that they are admitted to show the beliefs or attitudes of the respondents (as opposed to the truth of the respondents' answers), other polls are unquestionably hearsay.[10]

■ Such hearsay polls are not necessarily inadmissible as evidence in that they may fall into a recognized class exception[11] to the hearsay rule, as, for example, when they involve a present sense impression[12] or a presently existing state of mind.[13] *See, e. g., Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 680–86 (S.D.N.Y. 1963) (Feinberg, J.) (unfair competition case, in which a survey was admitted; survey respondents were shown a cigarette lighter and were asked which firm had manufactured it). If a survey or poll does not fit

---

8. The Club was unable to locate addresses for the sponsors of the remaining 125 events.

9. The method used to charge fixed and variable costs against income is described in note 3 *supra*.

10. In *United States v. 88 Cases, etc.*, 187 F.2d 967, 974 (3d Cir.), *cert. denied*, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951), this court characterized a poll as non-hearsay. (Housewives had been given an orange beverage to drink, and were asked whether or not it was orange juice.) In that case the poll sought to ascertain housewives' *beliefs* as to the contents of an orange drink, and was admitted to show those beliefs, and not to show the truth of the housewives' assertions (*i.e.*, whether or not it was orange juice). In the case *sub judice*, however,

the "survey" was clearly offered to prove the truth of the extrajudicial declarants' assertions.

We note that *88 Cases* has been criticized for its approach. *See Zippo Mfg. Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 680–86 (S.D.N.Y.1963); Note, *Public Opinion Survey as Evidence: The Pollsters go to Court*, 66 Harv. L.Rev. 498 (1953). *But see* Judicial Conference Study Group on Procedure in Protracted Litigation, *Handbook of Recommended Procedures for the Trial of Protracted Cases*, 25 F.R.D. 351, 427–28 & n.31 (1960) (citing *88 Cases* with apparent approval).

11. *See generally* Fed.R.Evid. 803 & 804.

12. Fed.R.Evid. 803(1).

13. Fed.R.Evid. 803(3).

into one of the class exceptions to the hearsay rule, it may nevertheless be admissible under Fed. R. Evid. 803(24).[14] In other words, the survey is admissible if it is material; if it is more probative on the issue than any other evidence; and if it has "circumstantial guarantees of trustworthiness" equivalent to those of the class exceptions (*i. e.*, if the "hearsay dangers"—principally, faulty memory and lack of sincerity—are greatly reduced, see, e. g., *Zippo Mfg. Co. v. Rogers Imports, supra* ). The proponent of such evidence, of course, has the burden of establishing these elements of admissibility.

■ In the context of polls and surveys, the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles, and if the results are used in a statistically correct way, since proper survey and statistical methods are intended to assure a poll's reliability. *See Allen v. Morton*, 333 F.Supp. 1088, 1094 (D.D.C.1971), which cautions that surveys, since they involve hearsay, must be conducted with proper safeguards to insure accuracy and reliability. The court in *Allen* gave little weight to a survey because of its technical deficiencies. The Judicial Conference Study Group, in its Handbook of Recommended Procedures for the Trial of Protracted Litigation, 25 F.R.D. 351, 429 (1960), discusses the several factors which must be examined when determining whether a poll meets generally accepted survey principles. A proper universe must be examined and a *representative* sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques. Just as important, the survey must be conducted independently of the attorneys involved in the litigation. The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. *A fortiori*, the *respondents* should be similarly unaware. *See Berman v. New Hampshire Jockey Club*, 324 F.Supp. 1156, 1168 (D.N.H.1971). *See generally* Annot., *Admissibility and Weight of Surveys or Polls*, 76 A.L.R.2d 619 (1961).

In *Zippo*, for example, the court admitted into evidence a consumer survey. The survey in that case was scientifically designed. The random sample was carefully chosen to obtain a representative cross-section of the universe. Methods were used which would minimize sampling and procedural errors. The interviewers were all experienced surveyors and were not informed about the litigation or the survey's purpose. The respondents—who had no interest in the litigation—were likewise uninformed. In such circumstances the court ruled that the survey was trustworthy because there were no substantial "hearsay dangers". There was no danger of faulty memory because of the nature of the question asked (which firm manufactured a cigarette lighter). There was no substantial danger of insincere responses because of the scientific sampling methods used. The district court judge noted, however, that a poll might well be inadmissible if, for example, the questions were "unfairly worded to suggest answers favorable to the party sponsoring the survey",

14. Fed.R.Evid. 803(24) provides:

> Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [is admissible] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

because in such a case the circumstantial guarantees of trustworthiness would be lacking. 216 F.Supp. at 684. *See also Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976); *President & Trustees of Colby College v. Colby College-N.H.*, 508 F.2d 804 (1st Cir. 1975); *Standard Oil Co. (Indiana) v. Standard Oil Co. (Ohio)*, 252 F.2d 65 (10th Cir. 1958); *United States v. Healthco, Inc.*, 387 F.Supp. 258 (S.D.N.Y.), *aff'd*, 535 F.2d 1243 (2d Cir. 1975).

The PPC survey clearly cannot meet the standards specified in the Handbook on Protracted Litigation or in *Zippo*. It was not scientifically designed; indeed, Dr. Kenkel had never before taken a poll. The sample consisting of 281 responses, while large in proportion to the universe of 815 challenged banquets, was not designed to be representative.[15] The respondents, who were all Club members and thus interested in the litigation, were told the precise nature of the litigation and the purpose of the survey. They consequently knew which responses would be helpful to PPC, and conversely, which would be harmful. Moreover, it was possible that a recipient of the questionnaire would fail to respond because he knew an honest response would be harmful to the Club's position. Thus the respon-

dents might have contained a higher percentage of those who could answer in a way helpful to the Club.

It therefore appears that PPC's survey suffers from a severe dearth of any circumstantial guarantees of trustworthiness. Both hearsay dangers—faulty memory and insincerity—loom large in the Club's poll. The respondents were not being asked for a present impression; rather they were being asked for details about banquets which had taken place many years before. In fact the covering letter, recognizing that the members' memories might be "dimmed or imperfect," nevertheless asked for a "best recollection." *See* note 7 *supra*. The respondents were all interested in PPC's prevailing in the lawsuit. Yet they were expressly advised about the nature of the litigation and the survey, as well as which answers would benefit the Club.[16]

In sum, the survey admitted by the district court was neither objective, scientific nor impartial. *See Berman v. New Hampshire Jockey Club, supra*.[17] As a result of its technical[18] and non-technical deficiencies, the PPC survey lacked the necessary safeguards of accuracy and reliability—the circumstantial guarantees of trust-

15. Indeed, Dr. Kenkel testified that he did not know what percentage of responses was necessary in order for a survey to be reliable. Tr. of Second Trial 104, App. at 453.

16. *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385–87 (7th Cir. 1976) (district court not clearly erroneous in according little weight to survey, in part because survey contained leading questions); *Sears, Roebuck & Co. v. All State Life Ins. Co.*, 246 F.2d 161, 171–72 (5th Cir.), *cert. denied*, 355 U.S. 894, 78 S.Ct. 268, 2 L.Ed.2d 192 (1957) (affirming exclusion of survey because it contained self-serving statements); *General Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F.Supp. 716 (W.D.Mich.1964) (excluded survey because of poor technique and leading question); *cf.* III Wigmore on Evidence § 769, at 155 (Chadbourn rev. 1970) (leading questions improper because they suggest the specific answer desired).

17. We find this case to be quite close to *Berman*, in which a survey was utilized in an

attempt to prove the common understanding of racing horse owners with respect to their entitlement to a certain portion of racetrack revenues. The survey consisted of a mailing of form letters, written by plaintiff or his counsel, to 589 owners (of a universe consisting of 3500–5000 owners). Fifty-nine owners responded. The letter gave the details of the lawsuit, and, as is the case here, the respondents would have benefited by answering in a particular way. The court refused to admit the poll because of its inherent untrustworthiness.

18. *See General Motors Corp. v. Cadillac Marine & Boat Co., supra; Allen v. Morton, supra*. These cases reject polls because of technical deficiencies and the use of improper methods. *But see E. I. DuPont de Nemours & Co. v. Yoshida Internat'l, Inc.*, 393 F.Supp. 502, 518 (E.D.N.Y.1975), suggesting that technical deficiencies in surveys ought to go to their weight and not to their admissibility, especially when conducted by reputable professionals.

worthiness. *See Allen v. Morton*, 333 F.Supp. 1088, 1094 (D.D.C.1971). Since the survey was hearsay, and was not admissible under any class exception to the hearsay rule, and since it lacked those guarantees required by Fed.R.Evid. 803(24), we hold that PPC's second survey was inadmissible, and that the district court erred by receiving it into evidence. *See United States v. Article of Drug, etc.*, 415 F.2d 390 (5th Cir. 1969).

The survey—which we have just held to be inadmissible—was the foundation for certain of the plaintiff's exhibits, and for much of Dr. Kenkel's testimony. Since this second survey should have been excluded, it follows that the evidence based on the survey should have been excluded as well. In particular, Dr. Kenkel's determinations as to amount of outside income and the percentage of gross receipts attributable to outside affairs could not have been admitted into evidence once the foundation for that testimony was excluded. For the same reason, the exhibits prepared by PPC's accountants and the testimony of accountant Di Mario, respecting the Club's net profits attributable to outside business, should not have been admitted into evidence.

The district court's findings of fact with respect to the amount of outside business, the gross revenues percentages, and net profits were all premised on the evidence which we have now held to be inadmissible. Since we have held that the survey evidence should have been excluded by the district court, the district court's findings are no longer supported by the record, and are therefore clearly erroneous.

### III

Inasmuch as we have determined that the district court erred in admitting the survey evidence, we are obliged once again to re-mand this case to the district court for additional proceedings. *See* Part IV of this opinion, *infra*. Because new calculations must be made to support any finding respecting net profits, we conclude that it is necessary to furnish the district court with an appropriate standard so as to avoid any possibility that we will once again be faced with an appeal raising this issue.

As we observed previously, PPC's accountants calculated net profits attributable to the Club's banquet activities by charging against banquet income an allocation of fixed and variable costs.[19] The net profits attributed to *outside* banquet income was determined to be two to four percent of total banquet net profits. (The percentage figure used was, of course, that derived from the second survey by Dr. Kenkel.) The record reveals that the costs so charged against banquet income were: cost of goods sold, wages and salaries, rent, depreciation, insurance, sales taxes, employees' insurance, supplies expenses, utilities, maintenance, and miscellaneous expenses.

In our opinion at No. 75–1757 we directed that the district court on remand make specific findings as to net profits derived from nonmembers. 536 F.2d at 575. In its attempt to comply with our mandate PPC proffered, and the district court accepted, the profit figures calculated in the manner described above. When we directed that "net profits" be examined, however, we assumed that the net profit calculation would be made within the context of the issue being disputed. Although under accounting principles in general, the net profit calculation might be deemed to include all the categories of charges listed above, we are not here concerned with normal methodology of accounting practice.[20] It is clear in this case that the literal accounting definition of "net profits" is not relevant to the ultimate inquiry of whether an exempt so-

---

19. The allocation was based on an approximation of the percentage which total *banquet* income was of total bar and restaurant sales. Note 4 *supra* contains a more detailed description of the method of allocation. *See* Plaintiff's Exhibits C 1 through C·6.

20. We do not quarrel with the methodology of PPC's accountants from a purely accounting perspective.

cial club is or is not engaged in sufficient nonmember business to justify the revocation of its exemption.

The exemption of IRC § 501(c)(7) extends only to social clubs "supported solely by membership fees, dues, and assessments." Treas.Reg. § 1.501(c)(7)–1. Congress intended that individuals be permitted to join together in appropriate organizations "to provide recreational or social facilities or other benefits on a mutual basis, without tax consequences . . . ." S.Rep.No. 91–552, 91st Cong., 1st Sess. 71, 1969–3 C.B. 469–70, U.S.Code Cong. & Admin.News 1969, pp. 1645, 2100. Such mutuality requires that the members share the benefits and burdens of the club. Consequently, when one member benefits through the use of the facilities of the club, it is only because all members have been "burdened" with the cost and support of those facilities. In other words, resources are merely shifted between members of such a group, and no tax consequences attach to that shifting. See McGlotten v. Connally, 338 F.Supp. 448, 458 (D.D.C.1972) (three-judge court).

It is obvious, then, that a club which derives substantial income from nonmember sources has eschewed that mutuality which is the basis for its exemption. In such a situation revenue derived from nonmembers is used to benefit members since the outside revenue permits the club to assess lower dues than would otherwise be required to support the club's facilities and operations. The club would be able to carry "as large and luxurious a plant as the members might like without the payment of burdensome dues." West Side Tennis Club v. Commissioner, 111 F.2d 6 (2d Cir. 1940).

■ Clearly, in light of the purpose of § 501(c)(7), the relevant inquiry with respect to outside profits is the amount by which members are benefited by the contri-

butions of nonmembers. Put another way, it is necessary to determine by what amount nonmembers may be subsidizing the club's members.[21] The amount of this subsidy is the proper measure of "net profits" as this court intended that concept to be employed when it first remanded for a finding as to net profits. 536 F.2d at 575.

■ Hence, it was undoubtedly proper to charge against outside banquet income the cost of goods sold, since those goods were used in generating that particular income. It was also proper to charge against outside banquet income other costs directly attributable to outside banquets, such as sales taxes, the wages of PPC employees earned while assigned to an outside function, and supplies used specifically for an outside banquet.

It was improper, however, to charge against outside banquet income those costs which were not incurred directly as a result of the outside banquet, but were rather fixed costs which the Club's members would have to bear in the absence of the nonmember income. We include in this category rent, depreciation, overhead salaries and wages (as contrasted with wages of an employee earned while assigned to a specific outside affair), utilities, maintenance, employees' insurance, and those taxes and supplies not attributable directly to an outside function. While we may not have listed all such items, the ones noted are representative of those charges which constitute the subsidy, the amount by which nonmembers benefit members. Had there been no outside functions, and therefore no nonmember income, the members of PPC would have been required to absorb these costs themselves, either through higher dues and assessments, or higher restaurant and bar fees charged members. In the alternative they may have opted for reduced services or less "large and luxurious" facilities. In ei-

---

21. Cf. S.Rep.No. 91–552, 91st Cong., 1st Sess. 71, 1969–3 C.B. 470 (use of a social club's interest income to reduce costs or increase services provided to members is a "distortion" of the social club exemption).

ther event it is the PPC membership which bears the burden.

The district court erred, therefore, by accepting PPC's "net profits" figures, since those figures included costs which were not directly attributable to the outside functions. Fixed costs and variable costs not incurred directly on account of an outside function cannot be charged against outside banquet income in calculating "profits" if the inquiry to be answered is whether a social club exemption was properly revoked. On remand, the district court should make its finding of "net profits" in a manner consistent with the instructions which we have outlined.

## IV

As we have observed, we must once again remand to the district court—albeit reluctantly—so that the findings called for by this court's first opinion may be made. The district court should, of course, utilize the proper measure of "net profits" (see Part III supra). It must also rule on the admis-

sibility of and weight to be given the first survey.[22]

■ Moreover, the district court should give careful consideration to the burden of proof placed upon the taxpayer to prove its exempt status. In this regard, the taxpayer has an obligation "to maintain records adequate to establish a right to the tax exemption", 536 F.2d at 576, and in particular to maintain adequate records which clearly show the frequency of nonmember use and the gross receipts derived therefrom, Rev.Proc. 71–17, 1971–1 C.B. 683, § 4 (superseding Rev.Proc. 64–36, 1964–2 C.B. 962, § 4); see IRC § 6001.[23]

The district court, on remand, shall make findings based on the record of the first trial, and so much of the record of the second trial as has not been held to be inadmissible by this court. It shall not, however, reopen the record or take additional evidence. PPC has already had two opportunities to produce evidence to satisfy

---

**22.** The first survey consisted of 20 responses out of 25 questionnaires sent to the PPC members who sponsored the 25 largest affairs in 1969. IRS had classified those 25 affairs as "outside." See 536 F.2d at 576 n.11; note 4 supra. If the first survey is held admissible, and depending upon the weight accorded to it, it might then support the Club's argument for exemption. While the first survey may lack the principal disability of the second survey, i.e., the objectionable cover letter, and may therefore be more trustworthy (less danger of insincerity), it nevertheless presents the same problems respecting members' faulty memories. We cannot help but observe that the first survey is also subject to objection by reason of its small sample size, its lack of a scientific sampling method, its use of stratified sampling, the possibility of a skew since only the largest functions were sampled, and the fact that the sample includes several banquets which the IRS classified as "inside." Although we note these factors, we express no opinion as to the survey's admissibility or the weight it should be accorded if admitted, particularly since at the first trial it appears that the Government did not object to its introduction into evidence, or to the testimony of witnesses based upon it.

**23.** The district court on remand should also note the possibility of a more liberal test for the amount of permissible outside business for taxable year 1971. The 1976 Amendments to the Tax Reform Act of 1969, Pub.L. 94–568, 90 Stat. 2697 (approved by the President on October 20, 1976), § 1, amended § 501(c)(7) to read "[c]lubs organized for . . . nonprofitable purposes, substantially all of the activities of which are for such purposes . . . ." (emphasis added). [The old language read "organized exclusively . . . for nonprofitable purposes".] It may be that the "substantially all" test of the 1976 Amendments (rather than the "exclusively" test of prior law) applies retroactively to all taxable years subject to the unrelated income tax of the Tax Reform Act of 1969, Pub.L. 91-172, 83 Stat. 487, § 121 (i.e., all taxable years beginning after December 31, 1969, in this case taxable year 1971). On the other hand, it may be that the "substantially all" test applies only prospectively, i.e., to taxable years beginning after October 20, 1976. Pub.L. 94–568, supra, § 1(d) ("The amendments made by this section shall apply to taxable years beginning after the date of enactment of this Act.") See Santa Barbara Club v. Commissioner, 68 T.C. 200 (1977). In the latter case, the more liberal test would not apply to any of the taxable years involved in this case.

its burden of proof. Having had two bites from the apple, PPC has had more than most litigants receive. PPC must therefore rest on the evidence adduced in the two trials it has already had.

The judgment of the district court will be reversed and the case remanded for further proceedings consistent with this opinion and with our opinion at No. 75–1757, 536 F.2d 572.[24]

---

24. If on remand the district court holds against PPC, it must then determine whether PPC's exemption could properly be revoked retroactively as of fiscal year 1967.

We would note that retroactivity in this case is governed by Rev.Proc. 72–4, 1972–1 C.B. 706, § 11.01, and not by the seemingly stricter provisions of Rev.Proc. 72–3, 1972–1 C.B. 705, § 1305. Rev.Proc. 72–3, § 13.05, applies to "rulings", *i.e.*, statements to the taxpayer by the National Office applying the law to a specific set of facts. Rev.Proc. 72–4, § 11.01, applies to determination letters by the District Director recognizing an exemption, such as is involved here.

Under IRC § 7805(b), the Secretary of the Treasury or his delegate is granted the discretion to prescribe the extent to which a ruling or regulation shall be applied without retroactive effect. The Commissioner's determination as to retroactivity may not be overturned unless there is an abuse of discretion. *Automobile Club v. Commissioner*, 353 U.S. 180, 184, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957); *Lesavoy Foundation v. Commissioner*, 238 F.2d 589 (3d Cir. 1956).

Exercising his discretion, the Commissioner set forth guidelines for the retroactive revocation of exemptions in Rev.Proc. 72–4, § 11.01, in which it is indicated that a revocation may be retroactive if the organization (1) omitted or misstated a material fact, (2) operated in a manner materially different from that originally represented, or (3) engaged in a prohibited transaction with the purpose of diverting corpus or income from its exempt purpose.

The IRS in this case points to guideline no. 2. It contends that the Club's Exemption Application stated that the sources of its income would be amounts paid by members for the *exclusive* use of facilities; and that nonmember other than bona fide guests would not be permitted to use the Club's facilities. IRS then argues that, since substantial revenue is derived from the use of facilities by nonmembers, the Club is operating in a "manner materially different from that originally represented."

The IRS also notes that during a 1964 audit the Club was warned that nonmember use would jeopardize its exempt status, and in response PPC sent a letter to the IRS stating that it has "discontinued allowing outside groups to use club facilities at any time." This fact may implicate guideline no. 1 (material misstatement) as well as guideline no. 2. The 1964 letter also raises the equitable argument that PPC was warned about outside functions, and that therefore the violation of the terms of its exemption was in a sense "knowing". PPC counters by arguing that the use of PPC's facilities by "outside groups", referred to in the 1964 letter, meant the use of the facilities by completely unrelated groups, as contrasted with member-sponsored "outside" groups. PPC Brief at 47. PPC also notes that Rev.Proc. 64–36, which set forth the concept of "outside" groups as including certain member-sponsored groups, was not issued until after the 1964 audit.

This court has previously considered the retroactive revocation of an IRC § 501(c)(3) exemption in *Lesavoy Foundation v. Commissioner, supra*. Based on *Lesavoy* it would be difficult to uphold a retroactive revocation of PPC's exemption if the revocation were based on a determination that the Club's 1967–71 practices were materially different from the representations contained in the 1956 exemption application as interpreted by IRS. In 1956 it was far from clear that a membership-sponsored function could result in nonmember derived income, or that such a function constituted a use of the Club by nonmembers. Rev.Proc. 64–36, which defined nonmember income to include that derived from certain member-sponsored activities, was not promulgated until 1964.

However, we do not express any view as to any other basis argued by the IRS for a retroactive revocation of PPC's exemption. The respective interpretations of the term "outside groups" in the 1964 letter, and any other facts bearing on the issue of retroactive revocation, are for the district court to consider in the first instance on remand, if the issue of retroactive revocation becomes relevant.