**RENSSELAER POLYTECHNIC INSTITUTE, Petitioner-Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.**

**No. 188, Docket 83–4101.**

United States Court of Appeals, Second Circuit.

Argued Nov. 4, 1983.

Decided April 11, 1984.

---

David I. Pincus, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, and Robert A. Bernstein, Attys., Tax Div., Dept. of Justice, Washington, D.C., of counsel), for respondent-appellant.

George C. Shattuck, Syracuse, N.Y. (Joseph P. Kubarek, Bond, Schoeneck & King, Syracuse, N.Y.), for petitioner-appellee.

Sheldon E. Steinbach, Washington, D.C., for amicus curiae American Council on Educ.

Christine Topping Milliken, Washington, D.C., for amicus curiae Nat. Institute of Independent Colleges and Universities.

Dorothy K. Robinson, New Haven, Conn. (Hughes, Hubbard & Reed, New York City, of counsel), for amicus curiae Yale University.

Before MANSFIELD, PIERCE and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The issue before us is not only one of first impression; it is also of considerable financial significance to many of our colleges and universities. When a tax-exempt organization uses one of its facilities, as in this case a fieldhouse, for both tax-exempt purposes and for the production of unrelated business income, what portion of its indirect expenses such as depreciation may it deduct from its unrelated business income pursuant to I.R.C. § 512 (1982)? May it allocate those expenses, as prescribed by Treas.Reg. § 1.512(a)–1(c), on any "reasonable" basis? Or must it first establish, as the commissioner here argues, that the expense would not have been incurred in the absence of the business activity? Finding no conflict between the regulation and the statute and finding no error in the determination of the tax court that RPI's method of allocation was reasonable, we reject the commissioner's position and affirm the tax court's judgment, which approved apportioning the fieldhouse's idle time in proportion to the hours devoted to exempt and non-exempt uses.

The facts are undisputed. Rensselaer Polytechnic Institute (RPI) is a non-profit educational organization entitled to tax-exempt status under I.R.C. § 501(c)(3). It owns and operates a fieldhouse which it devotes to two broad categories of uses: (1) student uses, which include physical education, college ice hockey, student ice skating, and other activities related to RPI's tax-exempt educational responsibilities; and (2) commercial uses, which include activities and events such as commercial ice shows and public ice skating, that do not fall within its tax-exempt function. For fiscal year 1974, the net income from commercial use of the fieldhouse constituted "unrelated business taxable income" which was subject to taxation under I.R.C. § 511(a)(1).

The dispute is over the amount of unrelated business tax due from RPI for 1974 and, since there is no disagreement over the gross income, $476,613, we must focus on the deductible expenses. The parties have classified RPI's applicable deductible expenses in three groups. The first group, "direct expenses", are those that can be specifically identified with particular commercial uses. For the year in question direct expenses amounted to $371,407, and the parties have always agreed to their deductibility.

The second group, "variable expenses", are those which vary in proportion to actual use of the fieldhouse, but which cannot be identified with particular events. They were originally in dispute before the tax court, but neither side has appealed that part of the decision below which (a) found the total variable expenses to be $197,210; and (b) allocated them on the basis of actual use, as claimed by RPI, rather than total availability, as claimed by the commissioner.

This appeal involves the third group, "fixed expenses", which do not vary in proportion to actual use of the facility. The amounts of fixed expenses incurred with respect to the fieldhouse were stipulated to be:

| | |
|---|---|
| Salaries and fringe benefits | $ 59,415 |
| Depreciation | 29,397 |
| Repairs and Replacements | 14,031 |
| Operating Expenditures | 1,356 |
| | $104,199 |

Narrowly stated, the issue is how these fixed expenses should be allocated between RPI's dual uses: the exempt student use and the taxable commercial use. RPI contends it is entitled to allocate the fixed expenses on the basis of relative times of actual use. Thus, in computing that portion of its deductible expenses, RPI multiplies the total amount of fixed expenses by a fraction, whose numerator is the total number of hours the fieldhouse was used for commercial events, and whose denominator is the total number of hours the fieldhouse was used for all activities and events—student and commercial combined.

The commissioner argues that the allocation of fixed expenses must be made not on the basis of times of actual use, but on the basis of total time available for use. Thus, he contends the denominator of the fraction should be the total number of hours in the taxable year. In practical terms, the difference between the two methods of allocation amounts to $9,259 in taxes.

Below, the tax court agreed with RPI's method of allocating on the basis of actual use, finding it to be "reasonable" within the meaning of Treas.Reg. § 1.512(a)–1(c). The commissioner appeals, contending (a) that the tax court's otherwise reasonable allocation based on actual use does not satisfy the statutory requirement that in order to be deductible an expense must be "directly connected with" the unrelated business activity; (b) that the cases the tax court relied on below, dealing with allocation of home office expenses between business and personal use, are inapposite; and (c) that strict application of the "directly connected with" language of the statute is "necessary to prevent serious abuse of the tax exemption privilege."

It has been the consistent policy of this nation to exempt from income taxes a corporation, like RPI, that is "organized and operated exclusively for * * * educational purposes * * *". I.R.C. § 501(c)(3). This preferred treatment to educational, as well as religious, charitable, and scientific institutions, was established simultaneously with the first income tax enacted by congress in 1913, and has been continued in identical language through a series of revenue acts down to and including the current provision contained in I.R.C. § 501. *E.g.,* 1954—ch. 1, § 501, 68A Stat. 163; 1936—ch. 690, § 101, 49 Stat. 1673; 1934—ch. 277 § 101, 48 Stat. 700; 1932—ch. 209, § 103, 47 Stat. 193; 1928—ch. 852, § 103, 45 Stat. 812; 1926—ch. 27, § 231, 44 Stat. 39; 1924 —ch. 234, § 231, 43 Stat. 282; 1921—ch. 136, § 231, 42 Stat. 253; 1919—ch. 18, § 231, 40 Stat. 1076; 1916—ch. 463, § 11, 39 Stat. 766; 1913—ch. 16, § II G(a), 38 Stat. 172. So firm was the policy shielding

educational institutions from taxation that, despite repeated challenges by the commissioner, the statute was consistently interpreted to exempt from taxation all income earned by an exempt corporation, even that obtained from activities unrelated to its tax-exempt educational purposes. *See Mueller Co. v. Commissioner*, 190 F.2d 120 (3d Cir.1951).

■ Recognizing, however, the unfair competitive advantage that freedom from income taxation could accord tax-exempt institutions that entered the world of commerce, congress, in 1950, extended the income tax to the "unrelated business income" of certain tax-exempt institutions, including educational corporations. Pub.L. No. 81–814, § 301, 64 Stat. 906, 947 (1950) (codified at I.R.C. §§ 511–513). Its objective in changing the law was to eliminate the competitive advantage educational and charitable corporations enjoyed over private enterprise, without jeopardizing the basic purpose of the tax-exemption. *See* H.R.Rep. No. 2319, 81st Cong., 2d Sess. 36–38; S.Rep. No. 2375, 81st Cong., 2d Sess. 28–30; *see also Louisiana Credit Union League v. United States*, 693 F.2d 525, 539–40 (5th Cir.1982).

With this historical background in mind, we turn to the applicable statute and regulations. Section 512 of the code defines as "unrelated business taxable income" gross income derived from unrelated business activities less deductions "directly connected with" such activities. Treas.Reg. § 1.512(a)–1(a) further defines the term "directly connected with", and provides that "to be 'directly connected with' the conduct of unrelated business for purposes of section 512, an item of deduction must have proximate and primary relationship" to' that business. Two subsequent subsections of that regulation define "proximate and primary relationship" in the contexts of (a) items that are attributable solely to the unrelated business, Treas.Reg. § 1.512(a)–1(b); and (b) as in this case, items that are attributable to facilities or personnel used for both exempt and unre-

lated purposes, Treas.Reg. § 1.512(a)–1(c). The latter regulation provides:

(c) *Dual use of facilities or personnel.* Where facilities are used both to carry on exempt activities and to conduct unrelated trade or business activities, expenses, depreciation and similar items attributable to such facilities (as, for example, items of overhead), *shall be allocated between the two uses on a reasonable basis.* Similarly, where personnel are used both to carry on exempt activities and to conduct unrelated trade or business activities, expenses and similar items attributable to such personnel (as, for example, items of salary) *shall be allocated between the two uses on a reasonable basis.* The portion of any such items so allocated to the unrelated trade or business activity is *proximately and primarily related to that business activity, and shall be allowable as a deduction in computing unrelated business taxable income* in the manner and to the extent permitted by section 162, section 167 or other relevant provisions of the Code.

Treas.Reg. § 1.512(a)–1(c) (emphasis added).

Thus, when allocated "on a reasonable basis", expenses attributable to such facilities or personnel—which expressly include such "indirect expenses" as depreciation and overhead—are by definition "proximately and primarily related" to the business. They are therefore "directly connected with" the unrelated business activity and expressly made deductible by the regulation.

■ Under this regulation, therefore, the critical question is whether the method of allocation adopted by RPI was "reasonable". The tax court found that it was, and, giving due regard to its expertise in this area, *ABKCO Industries, Inc. v. Commissioner*, 482 F.2d 150, 155 (3d Cir.1973), we see no error in that conclusion. Apportioning indirect expenses such as depreciation on the basis of the actual hours the facility was used for both exempt and taxable purposes sensibly distributes the cost

of the facility among the activities that benefit from its use. In addition, the method is consistent with that followed by the tax court in the most common dual-use situation, home office deduction cases. *See Browne v. Commissioner,* 73 T.C. 723 (1980); *Gino v. Commissioner,* 60 T.C. 304, *rev'd,* 538 F.2d 833 (9th Cir.1976), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976); *International Artists, Ltd. v. Commissioner,* 55 T.C. 94 (1970).

Indeed, the commissioner does not claim that RPI's allocation method is factually unreasonable, but instead contends solely that the method is not "reasonable", because by permitting depreciation during "idle time", when the fieldhouse is not being used at all, it contravenes the statutory requirement that deductible expenses be "directly connected with" RPI's unrelated business activities. By advancing this argument, however, the commissioner ignores his own definition of the concept "directly connected with" included in Treas.Reg. § 1.512(a)–1(a) discussed above. In addition, the commissioner would have us adopt a more stringent interpretation of "directly connected with" in § 512 than has been applied for over sixty years to the same concept in the commissioner's regulations governing the deductibility of ordinary and necessary business expenses. *See* Treas.Reg. § 1.162–1(a). Moreover, the logical extension of his position would require the commissioner to deny depreciation deductions to all businesses for those periods when their assets are idle. Such a view, however, would contravene the basic concepts underlying the commissioner's elaborate regulations governing depreciation generally. *See* Treas.Reg. § 1.167(a)–1 *et seq.*

For an expense to be "directly connected with" an activity, the commissioner argues that it must be one that would not have been incurred in the absence of the activity. But whether or not the fieldhouse is actually put to any business use, depreciation of the facility continues. We cannot accept the commissioner's argument, therefore, because it would in effect eliminate entirely all deductions for indirect expenses such as depreciation, a result that is not required by statute and that is directly contrary to the regulation.

The commissioner relies on *Pittsburgh Press Club v. United States,* 579 F.2d 751 (3d Cir.1978), to support his argument that indirect expenses that would have been incurred regardless of business use may not properly be deducted from unrelated business income. That case, however, arose under § 501(c)(7), which prohibited an exempt social club from engaging in any business activities. It is inapplicable here, because RPI, as an exempt educational institution, is permitted by statute to engage in unrelated business activities. The issue before us is not whether a business was carried on, but what is the proper allocation of indirect expenses, such as depreciation, between two uses, one a taxable business use and the other tax-exempt.

Furthermore, to apply the statute as the commissioner interprets it would not fulfill the congressional purpose of placing private enterprise on an equal level with competing businesses run by tax-exempt institutions, but would place RPI at a competitive disadvantage. Unlike business enterprises, it would be unable to allocate any of its indirect expenses to those periods when the fieldhouse was not being used at all.

Some concern has been expressed that RPI's allocation method would provide an incentive for educational institutions to abuse their tax-exempt status. The argument is a red herring. Use of educational facilities for producing unrelated business income is not tax abuse; on the contrary, as we have pointed out above, such non-exempt activities have been consistently permitted and, since 1950, expressly approved by congress. Moreover, should the trustees of a particular tax-exempt educational institution so pervert its operations that the institution no longer "engages primarily in activities which accomplish * * * [its exempt purposes]", Treas.Reg. § 1.501(c)(3)–1(c)(1), the commissioner has adequate remedies available to correct any abuse or even terminate the exemption.

The judgment appealed from is affirmed.

MANSFIELD, Circuit Judge (dissenting):

I respectfully dissent.

Rensselaer Polytechnic Institute ("RPI") is a tax-exempt institution only because it has dedicated itself and its property in perpetuity to "charitable" and "educational purposes." 26 U.S.C. § 501(c).[1] Its unrelated business income less "deductions ... which are directly connected with the carrying on of such trade or business" is taxable. 26 U.S.C. §§ 501(b), 512(a). We are here asked to permit the college to deduct from its commercial business income fixed expenses that would normally be allocated on a time basis to periods when the college's property is *not* being used for trade or business but for its educational purposes.

In my view such expenses are not "directly connected" with the institution's commercial business activities within the meaning of § 512(a) and are therefore not deductible from its business income. On the contrary, they are attributable to time when the facilities exist for educational purposes. Indeed, it could reasonably be argued that since RPI would, absent part-time use of its fixed assets for commercial purposes, be required to absorb all depreciation of such assets, no such depreciation is "directly connected" with its commercial business operations. See *Pittsburgh Press Club v. United States*, 579 F.2d 751, 761 (3d Cir.1978). RPI represented in its petition to the Tax Court that "[t]he main function of the fieldhouse is to provide a suitable facility necessary to allow petitioner to carry out *its total educational responsibilities.*" (Emphasis added). Although some allocation may be permissible, I do not believe RPI should be allowed to give its commercial use any credit for time when its facilities exist for educational use. To do so would give a tax-exempt institution an unfair tax advantage over commercial institutions. The majority reaches this result only by what appears to be a misinterpretation of the governing statute and regulations.

In my view the fundamental error underlying the majority's decision is its assumption that tax-exempt institutions are governed for tax deduction purposes by the same standards as those governing taxable businesses. That assumption conflicts with legislative intent, economic reality, and the express wording of the pertinent statute and regulations. When Congress in 1950 passed legislation subjecting tax-exempt organizations to income tax on unrelated business income, it was concerned both with removing the unfair competitive advantage enjoyed by tax-exempt institutions and with assuring that the unrelated business income would produce a fair amount of revenue for the public fisc.[2] However, it was confronted with inherent differences between a regular taxable business and a non-profit university engaged

**1.** Section 2 of the Act of the New York Legislature incorporating RPI (Chapter 151, Laws 1861, as amended by Chapter 229, Laws 1866, Chapter 277, Laws 1887, and Chapter 14, Laws 1907), provides:

"Sec. 2, Rensselaer Polytechnic Institute is hereby incorporated for the purpose of continuing and maintaining in the city of Troy and county of Rensselaer, a school for instruction in mathematics, civil engineering, chemistry, mineralogy, geology, botany, literature and the arts and their application to agriculture, domestic economy and manufacturing, as the trustees shall direct; and for the delivery of lectures on such subjects connected therewith as may be deemed necessary by said Board of Trustees."

**2.** The statute's dual purpose was emphasized by the Fifth Circuit in *Louisiana Credit Union*

*League v. United States*, 693 F.2d 525, 540 (5th Cir.1982):

"Clearly, Congress was concerned that commercial businesses operated by tax-exempt organizations would enjoy a competitive advantage. But other weighty considerations influenced passage of the unrelated business income tax as well. Revenue objectives played a major role in shaping that statutory design.... Furthermore, Congress also sought to eliminate an inherent inequity in the overall scheme of taxation by closing the loophole that allowed tax-exempt institutions to operate commercial businesses at no tax cost. Thus, although Congress enacted the predecessors of section 511–513 to eliminate a perceived form of unfair competition, that aim existed as a corollary to the larger goals of producing revenue and achieving equity in the tax system." (Footnotes omitted).

mainly in educational activity and only partially in income-producing commercial activities. These differences precluded a wholesale transfer and application to a university of the same deduction principles as those governing regular commercial businesses.

In the case of a commercial business devoted solely to making a profit, its entire operation is subject to a tax on its income. Regardless how it chooses to allocate its business expenses between divisions, the net income from all divisions is taxable. The IRS therefore has no quarrel with any "reasonable" allocation of deductible expenses between branches of the operation. The tax-exempt university, on the other hand, is fundamentally different in that one of its "divisions"—the educational function—is not subject to taxation. The university will therefore always have an incentive to minimize the allocation of expenses attributed to the educational function, and correspondingly to maximize the deduction for unrelated business activity. This incentive, which is not present in the ordinary business setting, requires a stricter standard of deductibility for tax-exempt organizations than for purely profit-seeking firms. The government cannot, in the case of an educational institution engaged in unrelated commercial business activity, afford to take the same relaxed approach as with wholly-taxable businesses and to accept any allocation the taxpayer may deem "reasonable."

Thus, the majority achieves parity only in the most superficial sense. The identical rule of deductibility is imposed, but it is imposed on organizations that have different characteristics and are therefore affected differently by the same rule. To whatever extent Congress sought to place wholly taxable and exempt organizations on the same footing, it was concerned not with such technical legal tests but with the real after-tax situations of the two different types of organization. Yet the majority's approach, which claims to provide equal treatment, actually leaves the tax-exempt organizations with the very advantage that the majority claims Congress was trying to eliminate.

That Congress adopted a narrower test of deductibility for the tax-exempt organization is clearly reflected in the statute. 26 U.S.C. § 512 allows such an organization to take those "deductions allowed by this chapter *which are directly connected with*" its unrelated business income (emphasis added). The italicized language is imposed as an *additional* requirement for tax-exempt institutions not faced by purely profit-oriented businesses.

If there were any doubt after reading the language of the statute that disparate standards have been prescribed by Congress, one needs only to look at the pertinent regulations. The regulation governing business deductions for the profit-seeking corporation, 26 C.F.R. § 1.162–1(a), is stated in the disjunctive: "Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with *or pertaining to* the taxpayer's trade or business." (Emphasis added). In stark contrast to this relatively broad test, the regulation concerning the tax on unrelated business income provides:

"§ 1.512(a)–1 Definition.

(a) *In general.* Except as otherwise provided ... section 512(a)(1) defines 'unrelated business taxable income' as the gross income derived from any unrelated trade or business regularly carried on, less those deductions allowed by chapter 1 of the Code *which are directly connected with* the carrying on of such trade or business.... *To be deductible in computing unrelated business taxable income,* therefore, expenses, depreciation, and similar *items not only must qualify as deductions allowed by chapter 1 of the Code, but also must be directly connected with the carrying on of unrelated trade or business ....* to be 'directly connected with' the conduct of unrelated business for the purposes of section 512, an item of deduction must have *proximate and primary relationship* to the carrying on of that business." (Emphasis added).

Thus, the regulation does not merely reiterate the statutory language; it goes on to expressly state that the "directly connected with" language is an *additional* requirement imposed on tax-exempt organizations that is not imposed on organizations subject only to Chapter One of the Internal Revenue Code. The status of the requirement as an additional one is reinforced by its definition of the deduction as one that must have a "proximate and primary" relationship, which is a far cry from being merely "pertinent to" the business operation. I find no such direct proximate connection between the expense and the conduct of the unrelated commercial business at issue in the present case where the depreciation is incurred for a period of idle time when the commercial activity is not being conducted on the premises being depreciated.[3]

The provision in Treas.Reg. § 1.512(a)–1(c) permitting allocation of expenses on a "reasonable basis," upon which the majority heavily relies, nowhere appears in the statute itself. It obviously must be read in light of subsection (a), which bears the caption "in general" and which explains the language of the statute. I can see no justification for reading subsection (c) in isolation from the more general provision of the regulation and from the controlling dictates of the statute. When subsection (c) is read together with subsection (a) it is clear that allocation between "two uses on a reasonable basis" requires that depreciation allocated to the unrelated business use, as subsection (c) expressly states, be "proximately and primarily related to that business activity." Thus even subsection (c) is not satisfied in the present case.

The majority's reliance on Tax Court home-office, dual-use cases (Maj.Op. ——) is clearly misplaced. It is true that the home-office situation is somewhat comparable to that of a tax-exempt institution engaged in taxable unrelated business activities. When a home is used as an office there is an incentive, as with tax-exempt institutions partially engaged in profit-making business, to allocate as large a percentage of all expenses as possible to the taxable activity. However, the analogy is seriously flawed because the homeowner is free to use his home for any purpose he chooses, while the university, in order to gain the tax-exempt treatment it enjoys, must dedicate its facilities to exempt purposes. Thus, while it might reasonably be argued that a home office's "idle time" is equally available for exempt and non-exempt purposes, and thus that depreciation accruing during that time should be divided in proportion to the periods used for business and living respectively, it is clearly *not* reasonable to make the same assumption with respect to a university's "idle time." If that idle time were equally available for unrelated business activity, the university would not have obtained its exemption in the first place.

Even if the home-office deduction were a useful point of comparison, there is another serious problem with the majority's position. Although the Tax Court has taken the position that depreciation of a home-office can be allocated on the basis of actual use rather than on total hours in the day, the Ninth Circuit has reached the opposite conclusion and has reversed the Tax Court on this issue. *See Gino v. Commissioner,*

**3.** The result of the majority decision is to permit a tax-exempt institution, which owns and operates a field house and rink in order "to carry out its total educational responsibilities," to deduct from unrelated business income depreciation attributable to periods of time when the facility is *not* being used for such commercial activities. "Depreciation accounting is a system ... which aims to distribute the cost ... of tangible capital assets ... over the estimated useful life of the unit ... in a systematic and rational manner." Research Study No. 7, Generally Accepted Accounting Principles for Busi-

ness Enterprises, Ch. 11, ¶¶ 55–56, by Paul Grady, American Institute of Certified Public Accountants, Inc. (1965). Rensselaer did not depreciate its rink according to use but according to time, using the widely accepted "straight-line" method under which the expense accrues at a uniform rate over the projected life of the asset being depreciated, whether it is actively used or idle. See Davidson, Handbook of Modern Accounting 18–9, 18–10 (1970). The expense, like interest or taxes, must therefore be allocated strictly on a time basis. Rensselaer cannot now retroactively change to a use method.

538 F.2d 833 (9th Cir.), *cert. denied,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 587 (1976); *see also, Lewis v. Commissioner,* 560 F.2d 973, 978 (9th Cir.1977). Under these circumstances the Tax Court decisions on this issue can hardly be viewed as authoritative.

*Pittsburgh Press Club v. United States,* 579 F.2d 751, 761 (3d Cir.), *on remand,* 462 F.Supp. 322 (W.D.Pa.1978), *rev'd,* 615 F.2d 600 (3d Cir.1980), is a more reliable precedent. In that case, the Third Circuit held that in determining a social club's taxable unrelated business income for the purpose of deciding whether to revoke its tax exemption, only those expenses which would not have been incurred but for the unrelated taxable activity could be deducted from gross unrelated business income.[4] Under this marginal expense test, exempt institutions could not deduct depreciation, since it accrues over time at a constant rate, regardless of the use to which the facility is put. *See* Davidson, Handbook of Modern Accounting 18–9, 18–10 (1970). The majority attempts to distinguish *Pittsburgh Press* on the ground that exempt social clubs are not permitted to earn any outside income, while universities are permitted to do so. However, that is not the case. The language of 26 U.S.C. § 501(c)(7), which creates a tax exemption for social clubs "no part of the net earnings of which inures to the benefit of any private shareholder," is *identical* to that of § 501(c)(3), which creates the same tax exemption for educational institutions. In both cases, the amount of unrelated business income that will be tolerated is a matter of degree. *See Pittsburgh Press, supra,* 615 F.2d at 603.

In short, *Pittsburgh Press* is not distinguishable, and the Commissioner would have been justified in denying RPI any depreciation deduction at all. That he did not do so, and instead adopted regulations which permit the college to take a limited deduction, ought not be grounds for this court to undermine a statutory and regula-

tory scheme that makes far more legal and economic sense than the superficially appealing solution adopted by the majority. Sympathetic as I am to the financial needs of hard-pressed private educational institutions seeking to cope with ever-mounting costs, Congress remains the only body that can change the law governing allocation of expenses between exempt and non-exempt uses.

For these reasons, I would reverse the Tax Court's decision.

---

**4.** "It was improper ... to charge against outside banquet income those costs which were not incurred directly as a result of the outside banquet, but were rather fixed costs which the

Club's members would have to bear in the absence of the nonmember income." *Pittsburgh Press Club v. United States,* 579 F.2d 571, 761 (3d Cir.1978).