**Joseph M. EWAYS, II; and Park Road Inn, Inc., on its own Behalf and as General Partner of Park Road Inn, Limited Partnership, Appellants,**

v.

**BOARD OF COMMISSIONERS OF BERKS COUNTY, County of Berks and Berks County Convention Center Authority.**

Commonwealth Court of Pennsylvania.

Argued June 12, 1998.

Decided July 24, 1998.

David M. Kozloff, Wyomissing, for appellants.

Daniel B. Huyett, Reading, for appellees.

Before PELLEGRINI and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

PELLEGRINI, Judge.

John Eways, II (Eways) appeals from an order of the Court of Common Pleas of Berks County (trial court) holding that the 5% hotel room tax imposed by Berks County Ordinance 1–97 enacted pursuant to authorization contained in the Third Class County Convention Center Act (Act) [1] is constitutional and that the proposed facility is a convention center within the meaning of the Act.

On December 27, 1994, the Pennsylvania Legislature adopted the Act that authorizes counties to create authorities for the purpose of operating convention centers. To fund its construction, operation and promotion, Section 23 of the Act, 16 P.S. § 13123, authorizes the county in which the convention center is located to impose a hotel room rental tax not to exceed 5% of the cost of the room. That provision also requires that 80% of the revenues received from the tax are to be used for the purpose of building and maintaining the convention center and the remaining 20% for tourist promotion.

In June of 1996, the Commissioners of Berks County (County) authorized the creation of the Berks County Convention Center Authority (Authority). The Authority intends to build the Berks County Convention Center, a 180,000 square foot multi-purpose facility in downtown Reading. The Convention Center includes the construction of an arena and the purchase and renovation of a theater, as well as 40,000 square feet of open space to accommodate a variety of events. To fund the Convention Center, in January 1997, the Commissioners adopted Ordinance 1–97 creating a 5% tax on all overnight room rentals at hotels located within a fifteen (15) mile radius of the proposed Convention Center site.

Eways, who owns and operates the Park Road Inn Hotel located approximately four-and-a-half miles from the proposed facility, filed suit seeking a declaration that the tax imposed under the Ordinance was unconstitutional as applied to him. He contended that the tax violated both the Equal Protection Clause of the United States Constitution

---

1. Act of December 7, 1994, P.L. 1375, *as amended*, 16 P.S. §§ 13101–13124.

and the Uniformity Clause of the Pennsylvania Constitution because it imposed a burden on his hotel without supplying a resultant benefit from any additional room rentals from the creation of the Convention Center. Eways also contended that the tax was illegal because it was imposed to build a facility that was primarily a sports arena that did not constitute a "convention center" as defined under the Act because it would not hold conventions or other types of events that would generate additional overnight stays for the hotel industry.[2] After the pleadings were closed, the matter proceeded to a bench trial where testimony centered upon burdens placed on Eways' hotel operation by the tax, as well as the testimony of experts concerning the events and the effect on hotel occupancy that would occur as a result of the construction of the proposed facility.

Eways testified that his hotel, the Park Road Inn Hotel, was in its second year of operation. While room rates and hotel occupancy has not suffered yet as a result of the imposition of the hotel tax, and, in fact, revenues had increased, he testified that revenues would probably be higher if the tax had not been imposed. Eways also testified that he had received some negative comments from guests of the hotel who were upset about having to pay the tax, and on several occasions the hotel actually had to reduce its room rates to reflect the price before the tax due to customer complaints on having to pay the tax. However, he also testified that he had not conducted any studies that showed the specific effect the hotel tax had on his particular hotel. John Nuttal (Nuttal), part of the management team at the Park Road Inn Hotel, admitted that while the rooms in Berks County were still priced lower than

hotels in surrounding counties that did not have to pay the tax, the Park Road Inn Hotel was still at a competitive disadvantage because its rates were even more expensive than they had been before the tax.

In support of his position that the proposed facility would not increase hotel occupancy, Eways offered the expert testimony of Robert Baade (Baade), Ph.D., an economist and an expert in the field of political economy. Dr. Baade testified that in his opinion, for a project such as the one in Reading to be successful for the hotel industry, it had to generate additional overnight stays. He stated that the number of additional overnight stays that would be generated by this project were not substantial enough to overcome the costs to the hotel industry caused by the tax. He based his opinion on the fact that the proposed facility would not attract events that would lead to additional overnight stays because most of the people that would attend such events would be locals who would not stay overnight. He also testified that the proposed facility would also compete for convention business with similar facilities in the area, such as the Hershey Convention Center. Dr. Baade opined that 75% of the hotel tax would be absorbed by the hotel industry with the remaining 25% being passed onto the public.

Mark Rosentraub (Rosentraub), Ph.D., an expert in the field of economics and urban affairs, also testified for Eways. He stated that while it was possible that the proposed facility would hold conventions and trade shows, it was likely that it would host existing shows that were currently held in competing facilities in the area and would not generate any new shows or events that would

2. *Section 3 of the Act provides that a convention center is to be defined as:*

> Any land improvement, structure, building or part thereof, or proprietary interest therein, whether owned by or leased by or to or otherwise acquired by an authority, appropriate for any of the following: large public assemblies, the holding of conventions, conferences, trade exhibitions, and other business, social, cultural, scientific, and public interest events, and all facilities, furniture, fixtures, and equipment necessary and incident thereto, including meeting rooms, dining rooms, kitchens, ballrooms, reception areas, registration and pre-

> function areas, truck loading areas, including access thereto, access ways, common areas, lobbies, offices, and areas appurtenant to any of the preceding, together referred to as the Main Convention Area, and also including other buildings, structures or facilities for use in conjunction with the foregoing including, but not limited to, provision for off-street parking, retail areas and other improvements related to the center owned or leased by or to an authority for the purpose of producing revenues to assist in defraying the costs or expenses of the convention center.
> 16 P.S. § 13103.

generate additional overnight stays that would benefit the hotel industry. In his opinion, the proposed facility would bring no economic development and would burden those affected by the tax without providing them with a resultant burden.[3]

To establish the economic effect of the Convention Center, the County called Louis Blynn (Blynn), an expert in the field of hospitality services. He testified that there was a demand for such a facility and that if it were built, it would be attractive to organizers and promoters of such events. He based that opinion on information he gathered through a "survey" of concert and convention promoters who told Blynn that they would be interested in bringing their events to the new Convention Center. In allowing this testimony, the trial court overruled an objection made by Eways to all of Blynn's testimony that relied on this "survey" because it was not conducted according to proper statistical and scientific principles and therefore was inaccurate, and, in any event, was impermissible hearsay because the responses to the survey were not subject to cross-examination.

As a result of his survey, Blynn testified that the proposed facility would attract events that would bring in approximately 21,000 additional overnight stays per year. While the anchor tenant of the facility would be a minor league hockey team, he testified that the facility would also attract a number of conventions, trade shows, family shows and concerts that would generate the additional overnight stays. The president of the East Coast Hockey League (ECHL) also related to Blynn that if the facility were built to league specifications, Reading would be at the forefront to receive a team. In reaching his conclusion, he also relied upon previous studies that were already admitted into evidence and on the performance of other facilities comparable to the one being built in Reading. Moreover, Blynn testified that

20% of the tax that would go to tourist promotion would be given to the Convention and Visitors' Bureau (Visitors' Bureau) which would use the money to increase tourism and promotion for the hotel industry, making the hotel industry much more successful than it would be on its own.

Buckner Wallingford (Wallingford), an economics and finance expert, also testified for the County that while the hotel tax could reasonably result in a one to two percent reduction in occupancy, that would be offset by about 13,000 additional overnight stays generated by shows held at the facility in addition to about 8,000 additional overnight stays that would occur as a result of increased promotion by the Visitors' Bureau. He also testified that since the tax went into effect, room rates rose by about 6.3% while revenues at the hotels affected by the tax rose about 6%. As for Eways' hotel, he stated that room demand grew by 24.5% for the first six months that the tax was effective while revenues rose approximately 29% in that same period. Wallingford stated that there was a net increase in revenues of over $844,000 to hotel owners after a deduction was made for the portion of the tax that could not be passed on to consumers.

Based upon the above testimony, the trial court concluded that Eways had failed to sustain his burden of showing that the tax was unconstitutional and that the proposed facility was a convention center as defined in the Act. The trial court found that the burden imposed on the hotels was slight in comparison to the benefit they would receive from the tax and the facility. In addition, he found the experts for the County to be credible that the facility would increase the demand for overnight stays and would be successful in attracting conventions, trade shows and a variety of other events. Eways then filed the instant appeal contending that:[4]

3. Both Drs. Baade and Rosentraub were also prepared to offer an opinion as to whether the proposed facility met the statutory definition of a convention center as set forth in the Act, but the trial court precluded them from doing so because that was an ultimate issue for it to decide.

4. It is within the province of the trial judge, sitting without a jury, to judge the credibility of the witnesses and to weigh their testimony. Our scope of review is merely to determine whether there is evidence in the record to justify the trial court's findings of fact. *Leventhal v. City of Philadelphia*, 518 Pa. 233, 542 A.2d 1328 (1988).

- The trial court erred in admitting Blynn's testimony because he based his opinion on a survey that was improperly conducted and did not allow for cross-examination;
- The trial court erred in concluding that the proposed facility was a "convention center" as that term is defined in the Act;
- The hotel tax imposed is unconstitutional as violative of the Due Process and Equal Protection Clauses of the United States Constitution and the Uniformity Clause of the Pennsylvania Constitution; and
- The trial court erred in finding that the proposed facility was an economically viable facility that would spur economic growth in the community in which it was located.

## I.

 Eways contends that the trial court erred in admitting the testimony of Blynn and relying upon it to reach the conclusion that the tax would provide a benefit to Eways.[5] He argues that Blynn's testimony is inadmissible because his study was not based on a valid scientific or statistical survey and, therefore, the results generated by Blynn's study were inaccurate and could not support his conclusions. He maintains that because Blynn did not specify the questions asked, identify the persons who asked the questions and who was contacted, his opinion was based entirely on hearsay that did not have any indicia of trustworthiness or reliability. He also contends that Blynn did not show that the survey was conducted in accordance with the methodology generally employed by experts in his field.

Because Pennsylvania courts have yet to consider to what extent an expert may rely upon hearsay survey responses in forming his or her opinion, Eways relies on the decision of the United States Court of Appeals for the Third Circuit in *Pittsburgh Press Club v. United States*, 579 F.2d 751 (3d Cir. 1978). *Pittsburgh Press Club* involved the tax-exempt status of the Pittsburgh Press Club (PPC). The PPC was granted a tax

exemption by the Internal Revenue Service (IRS) in 1959. In 1964, the IRS reexamined that status and came to the conclusion that outside groups were contributing and using the facility on numerous occasions throughout the year, jeopardizing the tax exempt status of the PPC. The IRS revoked the PPC's tax-exempt status in 1972 and assessed income taxes against the PPC from 1967 to 1971. PPC sued to recover the amount of taxes it had paid and as evidence in support of its position introduced a survey that it had commissioned to show that the outside revenue was less than the IRS claimed it to be and was within the limits that would allow it to keep its tax exempt status. The survey was essentially a mailing to members of the PPC asking them yes or no questions concerning events that happened several years prior to ascertain whether the events questioned by the IRS were actually held by members or outside organizations.

The district court admitted the survey, but the Third Circuit held that it was error to admit the survey because survey results are inadmissible hearsay unless the survey is conducted in accordance with generally accepted survey principles and the results are used in a statistically correct manner. The Third Circuit stated that for a survey to be admissible, it must meet several requirements of generally accepted survey principles such as:

- A proper universe must be examined and a representative sample chosen;
- The persons conducting the survey must be experts;
- The data must be properly gathered and accurately reported;
- The questionnaires and the manner of interviewing must meet the standards of objective surveying and statistical techniques; and
- The survey must be conducted independently of the attorneys involved in the litigation.

*Id.* at 758.

Because the survey in *Pittsburgh Press Club* did not follow those guidelines, the

---

5. The trial court's decision on evidentiary rulings is entitled to wide discretion and will not be disturbed absent a manifest abuse of discretion.

*Burkholz v. Department of Transportation,* 667 A.2d 513 (Pa.Cmwlth.1995).

Third Circuit held that the survey was flawed and was therefore inadmissible hearsay. The Court stated, however, that although the survey was hearsay, it could have been admitted under one of the exceptions to the hearsay rule under the Federal Rules of Evidence.

The United States Court Appeals for the Seventh Circuit had a different view in *Baumholser v. Amax Coal Company*, 630 F.2d 550 (7th Cir.1980). In that case, the Baumholsers sued Amax Coal Company (Amax) alleging that blasting at Amax's surface mine caused damage to their home. In support of their claim, they called a geologist who testified that the cause of the damage to the Baumholser home was Amax's blasting. His testimony relied in part on a survey he conducted in which he asked 169 residents living within a six-mile radius from Amax's mine about structural damage to their homes. The expert then extrapolated the results showing the respective damage to each of the homes and then testified based on those results. The survey itself was also admitted into evidence.

Amax claimed that the survey done by the expert was not done in accordance with proper survey principles and therefore yielded inaccurate results that rendered the survey inadmissible. Amax also argued that the testimony based on that survey was invalid as well. The Seventh Circuit, citing to *Pittsburgh Press Club*, agreed that the survey was inadmissible because it did not follow generally accepted survey principles and the results were not used in a statistically correct manner. Nevertheless, the court held that the lack of independent admissibility did not require a reversal because under Federal Rule of Evidence 703, the expert was entitled to rely on the survey in giving his testimony because it was evidence of the type normally relied upon by experts in his field. The court also found that because the trial court allowed extensive cross-examination of the expert, both on the reliability of the survey and the conclusions reached, and Amax produced its own experts as to the effects of the blasting, the admission of the survey did not have any prejudicial effect on the jury.

■ Although neither *Pittsburgh Press Club* nor *Baumholser* is binding on this Court, we believe the principles announced in *Baumholser* are more consistent with Pennsylvania law that experts may base their opinions on evidence that is otherwise inadmissible if the evidence is of the type reasonably relied upon by experts in their field of expertise. *Commonwealth v. Daniels*, 480 Pa. 340, 390 A.2d 172 (1978); *Commonwealth v. Bowser*, 425 Pa.Super. 24, 624 A.2d 125 (1993).[6] In *Primavera v. Celotex Corp.*, 415 Pa.Super. 41, 608 A.2d 515 (1992), *petition for allowance of appeal denied*, 533 Pa. 641, 622 A.2d 1374 (1993), the Superior Court explained the rationale for this exception to the hearsay rule as follows:

> The expert is assumed to have the mastery to evaluate the trustworthiness of the data upon which he or she relies, both because the expert has demonstrated his expert qualifications and because the expert regularly relies on and uses similar data in the practice of his or her profession. The kind of data contemplated by the rule is often, as it is in this case, the kind of data used daily by experts.

Contrary to what Eways contends, Blynn testified that the methods he used were widely accepted throughout his field and that the information he received was of the type normally relied upon by experts in the hospitality field for calculating demand for convention centers and hotel room stays. Furthermore, Blynn did not rely exclusively on the responses from others but also testified that he relied on two reports known as the Nu–Stadia report and the Peat Marwick Development Planning Study, both of which were offered into evidence by Appellants and admitted by the court. Moreover, Eways' counsel was permitted to cross-examine Blynn with respect to his sources and the reliability of the study and was also allowed

---

6. While not applicable, Rule 703 of the Pennsylvania Rule of Evidence, effective October 1, similarly provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be of the type perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

**14**

to call his own experts on the subject. Although the survey conducted by Blynn was not done in accordance to scientific or statistical principles and was inadmissible, because it was the type of information reasonably relied upon by an expert, the trial court properly permitted Blynn to give his opinion of the increased overnight stays partially based on the results of his survey.[7]

## II.

■ As to his contention that the tax is illegal because it is imposed to support a facility that is not a "convention center" as defined by the Act, Eways maintains that although the facility will hold an unspecified number of conventions and trade shows, the primary use of the facility will be for sporting and entertainment events that will not generate additional overnight stays for the hotel industry. Because the facility is not a convention center and will not meet the public purpose set forth to spur economic development in the area surrounding the Convention Center, Eways contends that the County imposed the tax for a purpose not permitted by the Act.

Recently, in *Torbik v. Luzerne County*, 548 Pa. 230, 696 A.2d 1141 (1997), a case strikingly similar to the present one, our Supreme Court, rejected the exact same argument made by Eways here. In *Torbik*, the Commissioners of Luzerne County authorized the creation of the Luzerne County Convention Center, a facility with 42,000 square feet of arena floor and 18,000 square feet for conference and convention center rooms. On May 22, 1996, the County Commissioners authorized a 5% tax on all rooms in Luzerne County. Plaintiffs, whose hotels were located twenty-four and twenty-one miles from the proposed site of the convention center, filed suit challenging the tax as unconstitutional and arguing that the proposed facility

was not a convention center as defined by the Act. Plaintiffs' expert testified that the facility in that case was an arena rather than a convention center because the primary focus of that facility was on spectator sports with most of the patrons being from the local market area. The trial court found that although there was a dedicated area for sporting events, there was additional space available for events other than sports and, thus, the facility was a convention center under the Act. The Supreme Court affirmed, holding that even if the primary purpose of the facility was for sporting events, it could still meet the statutory definition of a convention center under the Act if it held events other than sports that were contemplated by Section 3(j) of the Act. Because there was evidence that the Luzerne County facility would hold events other than sports, the Court upheld the decision of the trial court that the facility was a convention center.

■ Likewise, even though the proposed facility in this case can and will most likely be used for sporting events, that does not mean that the proposed facility does not fall with the Act's definition of a "convention center." Just as in *Torbik*, it is undisputed that at least four consumer shows and four trade shows are projected for the facility.[8] Just because Eways does not feel that the number of shows it will host is sufficient does not disqualify the proposed facility from falling within the definition of a convention center. Moreover, contrary to Eways' contention, there is nothing in the Act that requires a facility to attract additional overnight stays to fall within that definition. Because the proposed facility will hold events other than sporting events, under *Torbik*, the proposed facility is a convention center as defined by Section 3(j) of the Act.[9]

7. The trial court also stated that it did not give excessive weight to the testimony of Blynn, but instead relied on the legislative findings contained in the Act that a convention center would confer a benefit on the hotel industry in the area served by the convention center in determining that Eways would receive a benefit. *See Allen v. Morton*, 333 F.Supp. 1088 (D.D.C.1971) (opinion survey evidence should be given little weight

where there are technical defects in the way the survey was conducted).

8. Moreover, Eways' argument that the facility will not attract conventions is based on the testimony of his own experts, whom the trial judge found incredible on that issue.

9. Eways also argues that the trial court erred in refusing to allow his experts to give their opinion

### III.

■ Eways also contends that the tax, as applied to him, violates the Due Process and Equal Protection Clauses of the United States Constitution and the Uniformity Clause of the Pennsylvania Constitution because it places a burden on hotels without conferring any benefit. He argues that because the hotels will suffer a loss of demand for hotel rooms due to the tax, and there is evidence in the record to show that the proposed facility will not attract events that result in additional overnight stays that will benefit the hotel industry, the hotels subject to the tax are forced to bear the burden of the tax without receiving anything in return.[10] He maintains that the present case is similar to *Allegheny County v. Monzo*, 509 Pa. 26, 500 A.2d 1096 (1985), and that the tax should be struck down as unconstitutional.

In *Monzo*, our Supreme Court declared the tax on *all* hotels throughout Allegheny County unconstitutional because the plaintiff there would receive no benefit from a convention center built in Pittsburgh. The Court found that the challenger was able to demonstrate that the convention center harmed him by taking business away from his hotel and drawing patrons into hotels in downtown Pittsburgh, and that the plaintiff was actually being forced to subsidize his downtown competition without receiving any benefit.

However, our Supreme Court in *Leventhal, supra,* limited *Monzo's* holding. In *Leventhal,* the Philadelphia City Council enacted a hotel room tax pursuant to the Convention Center Authority Act that authorized cities of the first class to enact such a tax to be used for convention center purposes. The plaintiff, an owner and operator of a hotel located seven miles from the proposed site of the convention center, filed suit seeking a declaration that under *Monzo,* the hotel tax was unconstitutional as it applied to him because it violated the Due Process and Equal Protection Clauses of the United States Constitution and the Uniformity Clause of the Pennsylvania Constitution. In finding that the tax was constitutional, our Supreme Court noted that *Monzo* was limited to its unique set of facts and that the tax in *Monzo* failed to pass constitutional muster because "a substantial portion of the class taxed [in *Monzo* ] are afforded no benefits whatsoever while being significantly burdened." *Leventhal* at 233, 542 A.2d at 1332. It stated that in *Monzo,* there was no proof of any kind, either legislative findings or factual evidence, which showed that the convention center would benefit the county.

With respect to the proposed Philadelphia Convention Center, our Supreme Court in *Leventhal* found that none of the facts present in *Monzo* were present with respect to the Philadelphia facility. The plaintiffs in *Leventhal* not only failed to prove any actual harm from the tax, but also failed to show that they would not receive any benefit from the convention center. Most importantly, in *Leventhal,* the Court gave great weight to the legislative findings contained in the Convention Center Authority Act[11] not present in *Monzo,* that a convention center would provide a benefit to the entire hotel industry

---

on whether the proposed facility is a "convention center" as that term is defined in the Act. The trial court, as fact-finder, ruled that he did not need any assistance from the experts on whether the proposed facility was a convention center, and whether the proposed facility met the statutory definition of a "convention center" was the ultimate issue that it had to decide. Although an expert may give an opinion about an ultimate issue in a case, *see generally Kozak v. Struth*, 515 Pa. 554, 531 A.2d 420 (1987) (discussing the admission of expert testimony), the primary purpose of expert testimony is to assist the trier of fact in understanding complicated matters. *Duquesne Light Co. v. Woodland Hills School Dist.,* 700 A.2d 1038 (Pa.Cmwlth.1997). We agree with the trial court that such an opinion in this case would have been unnecessary.

10. The legislature has wide discretion in the exercise of its taxing power and the tax is presumed to be constitutionally valid. *Leventhal.* The person challenging the tax must prove that the tax "clearly, plainly and palpably violates the constitution." *Torbik.* In order for a tax to be unconstitutional, the burden imposed by the tax must be palpably disproportionate to the benefit received. In other words, has the state given *anything* for which it can ask a return? *Allegheny County v. Monzo,* 509 Pa. 26, 500 A.2d 1096 (1985).

11. Act of June 27, 1986, P.L. 267, *as amended,* 53 P.S. §§ 16201–16224.

in the area in which the center was located.[12] The Court in *Leventhal* concluded that *Monzo* was wholly inapposite and the tax was constitutional as applied to the plaintiff in that case.

Moreover, just last year in *Torbik* where the exact argument was made, our Supreme Court held that the hotel tax in that case as applied to the plaintiffs was constitutional. It reasoned that because the evidence in that case showed that the plaintiffs would not be harmed by the tax but would most likely benefit from the tax, the plaintiffs failed to satisfy their burden of showing that the tax in Luzerne County was unconstitutional.

Just as in *Leventhal*, Eways has been unable to show that the tax is unconstitutional as to him because there are legislative findings contained in the Act that a convention center will benefit the hotel industry in areas affected by the tax that are entitled to great weight and are *prima facie* evidence that a convention center will provide benefits to the hotel industry. *See Leventhal* at 242, 542 A.2d at 1333. Also, unlike in *Monzo*, the tax in this case only applies to hotels within a fifteen (15) mile radius of the proposed facility and not to an entire county, and the tax as applied to Eways' hotel is even less severe because it is located a mere four-and-a-half miles from the proposed facility, not on the other side of the county as was the plaintiff's hotel in *Monzo*. In fact, no other hotel is closer to the proposed facility than Eways.

Moreover, the trial court here found that the tax would not significantly burden the hotel and the proposed facility would provide

---

12. 16 P.S. 13102 made the following legislative findings.

(a) Legislative findings.—It is hereby determined and declared as a matter of legislative finding:

(1) That the health, safety and general welfare of the people of this Commonwealth are directly dependent upon the continual encouragement, development, growth and expansion of business, industry, commerce and tourism within this Commonwealth.

(2) That unemployment, the spread of indigency and the heavy burden of public assistance and unemployment compensation can be avoided by the promotion, attraction, stimulation, development and expansion of business, industry, commerce and tourism in this Commonwealth.

(3) That development of convention centers is appropriate within the Redevelopment Assistance Eligible Area of a third class county and that the attraction of business to this Commonwealth as a result of such development is an important factor in the continual encouragement, promotion, attraction, stimulation, development, growth and expansion of business, industry, commerce and tourism within the county seat, the surrounding counties and this Commonwealth as a whole.

(4) That the purpose of a convention center should be the promotion, attraction, stimulation, development and expansion of business, industry, commerce and tourism in the county seat, the surrounding counties and this Commonwealth as a whole.

(5) That the development of a convention center will provide benefits to the hotel industry throughout the entire area of the county where the center is developed.

(6) That the development of a convention center will also provide benefits to the restaurant and entertainment industries throughout the entire county where the center is located, to all other businesses and individuals benefited by the attraction of major conventions and tourists, to other individual businesses whose livelihood is dependent on major conventions and tourists and to the general public.

(7) That the need for and promotion of the type of facility which will provide significant benefits to the general public will require the expenditure of public money and that it is therefore appropriate to authorize a county to impose and collect a tax applicable within the entire territorial limits of the county to facilitate the development of a convention facility and the promotion of tourism within the county.

(8) That, to promote the development of convention centers within this Commonwealth, it is necessary to provide additional and flexible means of developing, constructing, designing, managing, financing and operating convention centers.

(9) That an important aspect of the development of convention centers should be the removal and redevelopment of blighted areas.

(b) Policy.—It is hereby declared to be the policy of this Commonwealth to promote the health, safety, employment, business opportunities and general welfare of the people of this Commonwealth by providing for the creation of third class county convention center authorities which shall exist and operate as public instrumentalities of the Commonwealth for the public purpose of promoting, attracting, stimulating, developing and expanding business, industry, commerce and tourism in this Commonwealth. This purpose is hereby declared to be a public purpose supporting the enactment of all provisions of this act for which public money may be spent and taxes may be imposed.

benefits not only to Eways' hotel, but to the entire hotel industry. The testimony of Blynn and Wallingford, which was credited by the trial court, showed that the facility would attract events that would increase the demand for hotel rooms providing a benefit to the hotel industry. The record also reflects that 20% of the tax would help promote tourism and the hotel industry more than the hotels could do on their own, thus providing an additional benefit. As in *Leventhal* and *Torbik,* because there are legislative findings and competent evidence to support the conclusion that the benefit of the tax outweighs the burden placed upon the hotel owners, the trial court properly held that the tax was constitutional.

### IV.

Finally, Eways contends that the trial court erred in concluding that the proposed Convention Center is an economically viable facility that will spur economic growth in the region. We agree with the County that it is not our duty nor the trial court's to decide whether the facility will be economically viable before it is built. The legislative findings in that Act were that the development of convention centers will encourage and stimulate economic development in the area surrounded by the convention center and, once again, we will defer to those findings. Moreover, the General Assembly declared that it is the policy of this Commonwealth that convention centers are to operate for the public purpose of "expanding business, industry, commerce and tourism...." Because it is not for the courts to interfere with the legislative decisions of either the General Assembly to authorize counties to create authorities to build and operate convention centers and levy a 5% hotel tax or a county's decisions to act on the General Assembly's authorization, we decline to address whether the trial court erred in finding that there was a reasonable belief that the Convention Center would be an economically viable facility.

Accordingly, for the above reasons, the order of the trial court is affirmed.

***ORDER***

AND NOW, this 24th day of July, 1998, the order of the Court of Common Pleas of Berks County at No. 97–1574, dated March 17, 1998, is affirmed.

FRIEDMAN, J., concurs in the result only.