**[J-38-2018] [MO: Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| SANDS BETHWORKS GAMING, LLC, | : | No. 216 MM 2017 |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA DEPARTMENT OF REVENUE; C. DANIEL HASSELL IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF REVENUE; AND THE PENNSYLVANIA GAMING CONTROL BOARD, | : | ARGUED: May 17, 2018 |
| Respondents | : | |

## CONCURRING OPINION

**JUSTICE WECHT**            **DECIDED: April 26, 2019**

The Pennsylvania Race Horse Development and Gaming Act[1] requires that each casino contribute a small portion of its gross slot machine revenue into a special fund called the Casino Marketing and Capital Development Account.[2] At the end of each fiscal year, the money in the CMCD Account is returned to the casinos in the form of certain mandatory distributions and discretionary grants. Under this system, some casinos will receive more from the CMCD Account than they pay into it, while others will receive little or nothing.

---

[1]      4 Pa.C.S. §§ 1101, *et seq.* ("Act" or "Gaming Act").

[2]      4 Pa.C.S. § 1407(c.1). I refer to this fund herein as "the CMCD Account."

The parties' briefs and arguments in this Court have focused overwhelmingly upon the question of whether the Act's collection-and-distribution scheme violates the Uniformity Clause of the Pennsylvania Constitution.[3] Nonetheless, today's learned Majority chooses instead to resolve this case principally upon the basis of *Allegheny County v. Monzo*, 500 A.2d 1096 (Pa. 1985), although even the Majority itself cannot specify with any confidence the constitutional provision upon which *Monzo* relied, or even whether any such provision is state or federal. *See* Maj. Op. at 6-7 n.6. Petitioner's Uniformity Clause challenge is much stronger and more coherent than the hopelessly muddled *Monzo* precedent and the strikingly vague "Fourteenth Amendment" rationale upon which the Majority seems to rely.[4]

The tax scheme challenged here violates our Uniformity Clause. There is no need to reach any of Petitioner's ancillary arguments. I agree with the Majority that the challenged provisions are unconstitutional, but my conclusion rests upon the Uniformity Clause rather than upon *Monzo*.

**I.**

For as long as licensed casinos have existed in this Commonwealth, they have been subject to a 34% "daily tax" on all Gross Terminal Revenue ("GTR"), which the Gaming Act defines as the sum of all "cash or cash equivalent wagers received by a slot machine," minus amounts paid out to players in various forms. 4 Pa.C.S. § 1103 (defining gross terminal revenue). The Pennsylvania Department of Revenue collects this tax, and then transfers the proceeds into the State Gaming Fund. 4 Pa.C.S. § 1403(c)(1).

---

[3]     PA. CONST. art. VIII, § 1.

[4]     *See*, *e.g.*, Maj. Op. at 6-7 n.6 ("more recent cases have been somewhat ambiguous as to which Fourteenth Amendment precept – due process or equal protection – was involved").

In October 2017, the General Assembly passed Act 42, and the Governor signed it into law. Act 42 dramatically expanded lawful gambling in Pennsylvania. Among many other things, the legislation allows gaming at airports and truck stops, 4 Pa.C.S. §§ 13B20, 3514, legalizes sports wagering, 4 Pa.C.S. § 13C11, regulates daily fantasy contests, 4 Pa.C.S. §§ 301-342, and authorizes some forms of internet gaming. 4 Pa.C.S. §§ 13B02-13B63.

At issue in this case is Act 42's requirement that each Category 1, Category 2, and Category 3 slot machine licensee pay a supplemental daily assessment equal to 0.5% of the facility's GTR.[5] The licensees deposit these daily assessments into the CMCD Account, where they accumulate until the beginning of the next fiscal year, at which time the Gaming Control Board ("the Board") must distribute the previous year's collections back to the assessed casinos.[6] Any funds that the casinos receive from the CMCD Account must be used for "marketing" or "capital development." The Gaming Act provides no definition of these terms, apart from mandating that "the term 'capital development' shall include, but not be limited to, expansion or renovation of an existing licensed facility or constructing or expanding amenities at a licensed facility." 4 Pa.C.S. § 1407.1(g).

Disbursements from the CMCD Account are of two types: distributions and grants. First, the Board *must* make certain mandatory distributions to casinos with GTR that falls

---

[5]     A Category 1 license allows the holder to place slot machines at an existing horse racetrack, a Category 2 license authorizes the operation of slot machines in a stand-alone facility, and a Category 3 license allows for the placement of slot machines at an established "resort hotel" with at least 275 guest rooms. *See* 4 Pa.C.S. §§ 1301-1305.

[6]     Although the CMCD Account is separate from the State Gaming Fund, the Gaming Act instructs the Board to withdraw $2 million from the State Gaming Fund and deposit it into the CMCD Account at the end of each fiscal year. 4 Pa.C.S. § 1408(C.1) ("Beginning July 1, 2017, and each year thereafter, $2,000,000 shall be transferred to the Casino Marketing and Capital Development Account."). In other words, the sum of all CMCD Account distributions made in a particular year will be equal to the revenue generated by the supplemental daily assessment for that year plus $2 million.

within a prescribed range. For example, a Category 1 or Category 2 casino with GTR of $150 million or less will receive a $4 million mandatory distribution, a Category 1 or Category 2 casino with GTR over $150 million but under $200 million will receive a $2.5 million mandatory distribution, and a casino with GTR of $200 million or more will receive no mandatory distribution. 4 Pa. C.S. § 1407.1(e)(1)(i)-(iii). A Category 3 casino, on the other hand, will receive a $500,000 mandatory distribution if its GTR is under $50 million.

After the Board makes all of the mandatory distributions, it must spend any money remaining in the CMCD Account on discretionary grants. Casinos may apply for these grants, and the Board has discretion to determine which casinos receive them. 4 Pa.C.S. §§ 1407.1(c)-(e) (instructing the Board to establish application procedures and program guidelines for discretionary grants from the CMCD Account).[7]

The Gaming Act places three limits on the Board's grant-issuing discretion. First, Category 4 licensees (operators of "mini casinos") are not subject to the supplemental daily assessment and therefore are ineligible to receive grants. 4 Pa.C.S. § 1407.1(e)(2). Second, no licensee can receive more than $4 million from the CMCD Account in a single year. 4 Pa.C.S. § 1407.1(e)(3)(i). This means, for example, that a licensee which receives a $4 million mandatory distribution cannot also receive a discretionary grant in the same year. Finally, a licensee cannot receive any funds (mandatory or discretionary) from the CMCD Account during its first two years of operation. 4 Pa.C.S. § 1407.1(e)(3)(ii).

---

[7] *See* Pennsylvania Gaming Control Board, *Casino Marketing and Capital Development Grant Program: Program Guidelines*, available at https://gamingcontrolboard.pa.gov/files/grant_program/Casino_Marketing_and_Capital_ Development_Grant_Program.pdf (explaining that grant applicants must provide a written statement describing the specific "projects and/or uses for which the grant is sought") (last visited Mar. 19, 2019).

To facilitate understanding of how these rules might affect Pennsylvania's casinos in practice, I offer the following table, which shows the most recent financial data published by the Gaming Control Board.[8]  The table illustrates: (1) the dollar amount that each casino contributed to the CMCD Account during the fiscal year that ended on June 30, 2018; and (2) the total mandatory distribution, if any, to which each casino would be entitled under Act 42's distribution formula.[9]

|  | GTR (FY 17/18) | Supplemental Daily Assessment | Mandatory Distribution |
|---|---|---|---|
| Parx | $400,733,138 | $2,003,666 | $0 |
| Sands | $302,054,464 | $1,510,272 | $0 |
| The Rivers | $274,238,465 | $1,371,192 | $0 |
| The Meadows | $209,520,273 | $1,047,601 | $0 |
| Hollywood | $207,355,560 | $1,036,778 | $0 |
| Mohegan Sun | $202,793,257 | $1,013,966 | $0 |
| Harrah's | $199,718,368 | $998,592 | $2,500,000 |
| SugarHouse | $178,910,959 | $894,555 | $2,500,000 |
| Mount Airy | $146,997,589 | $734,988 | $4,000,000 |
| Presque Isle | $114,436,868 | $572,184 | $4,000,000 |
| Valley Forge | $86,686,698 | $433,433 | $0 |
| Nemacolin | $28,875,296 | $144,376 | $500,000 |
| Total[10] | $2,352,320,935 | $11,761,605 | $13,500,000 |

---

[8]     *See* Pennsylvania Gaming Control Board, *Annual Report 2017-2018*, available at https://gamingcontrolboard.pa.gov/files/communications/2017-2018_PGCB_Annual_ Report.pdf (last visited Mar. 19, 2019).

[9]     As with any business, many variables can influence a casino's financial results in a given year.  The exercise is intended only to help explain the mechanics of this somewhat complex statutory scheme.

[10]     Six of these casinos (Harrah's, The Meadows, Mohegan Sun, Parx, Hollywood, and Presque Isle) operate under a Category 1 license; four of them (Mount Airy, Sands, The Rivers, and SugarHouse) are stand-alone casinos that operate under a Category 2 license; and the remaining two (Valley Forge and Nemacolin) are resort casinos which operate under a Category 3 license.

As shown above, the supplemental daily assessment generated just over $11.76 million in revenue in fiscal year 2017-2018. In addition to that amount, the Board should have transferred an additional $2 million into the CMCD Account from the State Gaming Fund, meaning that the balance in the CMCD Account at the end of the fiscal year was about $13.76 million. Had this Court not entered a temporary injunction preventing the Board from distributing CMCD funds, the Board would have been required to pay a collective $13.5 million in mandatory distributions to SugarHouse, Harrah's, Mount Airy, Presque Isle, and Nemacolin—five of the six lowest-GTR casinos in the state. After making those payments, the Board would have awarded the remaining funds (approximately a quarter million dollars) to one or more casinos in the form of discretionary grants.

Technically, all casinos are eligible to receive up to $4 million per year from the CMCD Account. Still, as the table above shows, in general, high-GTR casinos necessarily will end up subsidizing a portion of lower-GTR casinos' marketing and capital development expenditures.

## II.

Sands Bethworks Gaming, LLC ("Sands") operates a casino in Bethlehem, Pennsylvania. During the 2016-2017 tax year, Sands operated over 3,000 slot machines at its casino, a location that brought in more than $300 million in GTR. Sands' Verified Petition at 5-6, ¶ 8. Like all Category 2 licensees, Sands is subject to the Gaming Act's supplemental daily assessment. But Sands does not expect that its GTR ever will fall below the $200 million threshold required to receive a mandatory distribution from the CMCD Account.

In December 2017, Sands filed with this Court a Petition for Review in the nature of a complaint seeking a declaratory judgment that the supplemental daily assessment is

unconstitutional.[11]   Sands alleged that the Act's supplemental assessment scheme (consisting of the daily assessment, the mandatory distributions, and the discretionary grants): violates the Uniformity Clause and the Special Laws Clause of the Pennsylvania Constitution, PA. CONST. art. VIII, § 1; *id.* art. III, § 32; violates the Equal Protection and Due Process clauses of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1; and serves no legitimate public purpose. *See Tosto v. Pa. Nursing Home Loan Agency*, 331 A.2d 198, 202 (Pa. 1975) (explaining that legislation must be non-arbitrary, rational, and reasonably designed to effectuate a public purpose).

The Majority declines to consider Sands' primary argument: that the Gaming Act's supplemental assessment scheme violates the Uniformity Clause of the Pennsylvania Constitution.  Instead, the Majority opts to resolve this case principally on the strength of *Monzo*'s welter of rationales.[12]  Respectfully, I believe that this choice is misguided, for at least three reasons.

First, the principal authority upon which the Majority relies, *Monzo*, is a decision so vague and disjointed that its reasoning is virtually indecipherable.   Neither I nor the Majority, for example, can identify the particular constitutional provision—or even the Constitution (state or federal)—upon which the *Monzo* Court's holding relies.   The Majority itself concedes that the *Monzo* Court did not "provid[e] developed reasoning distinguishing [between the asserted constitutional] violations."  *See* Maj. Op. at 7 n.6. The Majority is being charitable.  In truth, *Monzo*'s discussion ambles all about, defying any attempt at meaningful interpretation.   Perhaps the *Monzo* Court might have been relying on equal protection concepts.  *See Monzo*, 500 A.2d at 1102.  Or it might have

---

[11]     Because Sands' complaint raises challenges to the constitutionality of the Gaming Act, it falls within this Court's original jurisdiction.   *See* 4 Pa.C.S. § 1904 ("The Pennsylvania Supreme Court shall have exclusive jurisdiction to hear any challenge to or to render a declaratory judgment concerning the constitutionality of [the Gaming Act].").

[12]     *See, e.g.,* Maj. Op. at 15 n.9 (citing "various theories courts have used").

relied upon due process theories. *Id.* at 1102 (quoting *Airway Arms, Inc. v. Moon Area Sch. Dist.*, 446 A.2d 234, 243 (Pa. 1982)). Or, wait, perhaps it was the Uniformity Clause after all. *Id.* (citing *Commonwealth v. Staley*, 381 A.2d 1280 (Pa. 1978)). Perchance it was an unconstitutional "taking." *Id.* Alternatively, it could have been Article III, Section 32's prohibition on special laws. *Id.* at 1106. Or perhaps it was all five of those theories, tossed around in a veritable jurisprudential buffet—*Monzo* offers something for everybody, and consequently delivers nothing.

Second, critical aspects of the *Monzo* Court's reasoning are premised upon wholly irrelevant judicial decisions. For example, *Monzo* derived one of its key pronouncements—"that money may not be expropriated constitutionally from one group to the benefit of another"—from *United States v. Butler*, 297 U.S. 1 (1936), a much-criticized[13] *Lochner*-like case that struck down a New Deal tax on agricultural processors. *Butler* concerned the United States' Congress' authority to tax and spend for the general welfare, *see* U.S. CONST. Art. I, § 8, cl. 1, yet *Monzo* concluded, based in part on *Butler*, that a tax violates the "Fourteenth Amendment" if the burden imposed is "palpably disproportionate" to the benefit received. *Monzo*, 500 A.2d at 1102. There is no untying this knot. I have tried.

Given *Monzo*'s shaky foundation and amorphous legal standard,[14] it is not surprising that our appellate courts have been constrained to limit and avert their eyes

---

[13]     Federal courts have recognized that *Butler* "relied on an overly narrow view of Congress' enumerated powers," and that its analysis "has been discredited as flawed and unworkable, and has not been followed." *Kansas v. United States*, 214 F.3d 1196, 1201 n.6 (10th Cir. 2000); *see Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 286 (5th Cir. 2005); *accord* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW § 5-b, at 836 (3d ed. 2000) ("[T]he Supreme Court has effectively ignored *Butler* in judging the limits of congressional spending power.").

[14]     *See*, *e.g.*, *Monzo*, 500 A.2d at 1102 ("Where the benefit received and the burden imposed is palpably disproportionate, a tax is not only a taking without due process under

from *Monzo*'s grab-bag holding in case after case. *See*, *e.g.*, *Bold Corp. v. Cty. of Lancaster*, 801 A.2d 469, 476 (Pa. 2002) (distinguishing *Monzo* and upholding Lancaster County's hotel room tax); *Appeal of Torbik*, 696 A.2d 1141, 1146 (Pa. 1997) (distinguishing *Monzo* and upholding Luzerne County's hotel room tax); *Leventhal v. City of Phila.*, 542 A.2d 1328, 1332 (Pa. 1988) (distinguishing *Monzo* and upholding Philadelphia's hotel room tax); *Barrel of Monkeys, LLC v. Allegheny Cty.*, 39 A.3d 559, 569 (Pa. Cmwlth. 2012) (distinguishing *Monzo* and upholding Allegheny County's tax on alcoholic beverages); *Edwards v. Cty. of Erie*, 932 A.2d 997, 1001 (Pa. Cmwlth. 2007) (distinguishing *Monzo* and upholding Erie's hotel room tax); *English v. Commonwealth*, 845 A.2d 999, 1005 n.12 (Pa. Cmwlth. 2004) (distinguishing *Monzo* and upholding a statute creating a Regional Asset District); *Eways v. Bd. of Com'rs of Berks Cty.*, 717 A.2d 8 (Pa. Cmwlth. 1998) (distinguishing *Monzo* and upholding Berks County's hotel room tax); *Airpark Intern. I v. Interboro Sch. Dist.*, 677 A.2d 388, 394 (Pa. Cmwlth. 1996) (distinguishing *Monzo* and upholding a tax on commercial parking lots). If the instant case truly required that I grapple with the due process, equal protection, and other concepts tossed about in the *Monzo* blender, I would happily wade in. But because the CMCD collection-and-distribution scheme violates the well-settled Uniformity Clause principles that have been the focus of this case, I would save the question of whether *Monzo* retains any continuing vitality for some future controversy. At this point, suffice it to say that I am skeptical.

Finally, as this Court's Uniformity Clause decisions have explained, "federal equal protection jurisprudence . . . sets the floor for Pennsylvania's uniformity assessment." *Downingtown Area Sch. Dist. v. Chester Cty. Bd. of Assessment Appeals*, 913 A.2d 194, 200 (Pa. 2006) (citing 1 WADE J. NEWHOUSE, CONSTITUTIONAL UNIFORMITY AND EQUALITY IN

the Fourteenth Amendment to the United States Constitution, but also an arbitrary form of classification in violation of equal protection and state uniformity standards.").

STATE TAXATION 27-28 (2d ed. 1984)). In other words, if the Majority is correct that the challenged tax scheme violates the Fourteenth Amendment to the United States Constitution, and assuming that the Majority relies upon the Equal Protection Clause (something to which today's Majority will not commit), then the scheme necessarily violates the Uniformity Clause of the Pennsylvania Constitution as well. Because of this overlap between constitutional doctrines, and because there are many reasons to question the correctness of our holding in *Monzo*, this Court should have begun and ended its analysis with Sands' Uniformity Clause challenge.

**III.**

I am persuaded by Sands' contention that the Gaming Act's supplemental assessment scheme violates the Uniformity Clause of the Pennsylvania Constitution. Sands argues that the Act's collection-and-distribution scheme impermissibly ties each casino's tax liability to its annual revenue, creating what amounts to a graduated-rate tax of the sort that the Uniformity Clause prohibits. Sands acknowledges that the supplemental daily assessment's rate is the same for every casino (0.5% of GTR), but argues nevertheless that the overall scheme is rendered non-uniform by virtue of the fact that some casinos will "receive a payout back from the CMCD Account," which Sands likens to a "tax credit or refund." Brief for Sands at 20.

In making this argument, Sands relies upon decisions from this Court which have held that the non-uniformity of a tax need not be explicit on the face of the statute. *Id.* at 22-23. In *Cope's Estate*, 43 A. 79 (Pa. 1899), for example, we explained that the Uniformity Clause guards against any "device that necessarily or intentionally infringes on the established rules of uniformity and relative equality[.]" *Id.* at 81. In *Clifton v. Allegheny County*, 969 A.2d 1197 (Pa. 2009), we underscored that the Uniformity Clause prohibits any "method or formula for computing a tax" that will, "in its operation or effect,

produce arbitrary, unjust, or unreasonably discriminatory results." *Id.* at 1211. And in *Shelly Funeral Home v. Warrington Township*, 57 A.3d 1136 (Pa. 2012), we explained that, "irrespective of how taxes are described, reviewing courts assess their validity based on how they operate in practice." *Id.* at 1141.

Respondents—the Pennsylvania Department of Revenue, the Secretary of the Department of Revenue, and the Pennsylvania Gaming Control Board—do not dispute that a tax statute which classifies similarly situated taxpayers based solely upon their incomes violates the Uniformity Clause. Brief for Respondents at 23. They contend, however, that the supplemental daily assessment does not violate this precept, since every casino is assessed at a uniform 0.5% rate regardless of GTR. Thus, in Respondents' view, Sands is attempting to challenge the post-collection distribution of tax revenue, which Respondents believe is not constrained by the Uniformity Clause. *Id.* at 25 (arguing that the Uniformity Clause "has no application whatsoever to post-collection distributions."). For this reason, Respondents object to Sands' characterization of a mandatory distribution from the CMCD Account as a "tax credit," since it is not technically an offset against taxes owed. *Id.* at 26 (citing *Berks Cty. Tax Collection Comm. v. Pa. Dep't of Cmty. & Econ. Dev.*, 60 A.3d 589, 592 (Pa. Cmwlth. 2013) ("A tax credit is commonly accepted to mean a direct reduction against the liability for tax owed.")). Put differently, Respondents suggest that a casino which is entitled to a mandatory distribution still *owes* the full 0.5% assessment, even if it can expect to get that money back at some point in the future.

## IV.

The Uniformity Clause of the Pennsylvania Constitution provides: "All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art.

VIII, § 1. As interpreted by this Court, the Uniformity Clause requires that every tax "operate alike on the classes of things or property subject to it." *Commonwealth v. Overholt & Co.*, 200 A. 849, 853 (Pa. 1938). This means that, "when a method or formula for computing a tax will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated." *Clifton*, 969 A.2d at 1211.

The General Assembly, of course, possesses wide latitude in matters of taxation, *Aldine Apartments v. Commonwealth*, 426 A.2d 1118, 1121 (Pa. 1981), and this Court has stressed that the Uniformity Clause does not mandate absolute equality or perfect uniformity. *Columbia Gas Corp. v. Commonwealth*, 360 A.2d 592, 595 (Pa. 1976). When faced with a challenge to the validity of a tax classification, we ask whether the legislature's classification is based upon some legitimate distinction between the classes such that it provides a non-arbitrary, "reasonable and just" basis for the disparate treatment. *Aldine Apartments*, 426 A.2d at 1121-22. The critical question is whether there exists "some concrete justification" for treating the relevant group of taxpayers as members of distinguishable classes. *Columbia Gas Corp.*, 360 A.2d at 595-97. Absent such a legitimate distinction, the imposition of unequal tax burdens upon similarly situated taxpayers is unconstitutional. *Amidon v. Kane*, 279 A.2d 53, 63 (Pa. 1971).

This Court consistently has held that taxes with rates that vary based upon the quantity or value of the property being taxed violate the Uniformity Clause. In *Cope's Estate*, 43 A. 79 (Pa. 1899), for example, we considered a Uniformity Clause challenge to Pennsylvania's inheritance-tax statute, which exempted from taxation the first $5,000 worth of property in every estate. Because of that $5,000 exemption, 90-95% of all estates paid no inheritance tax, while the remaining 5 to 10% paid a 2% tax. We held that the exemption violated the Uniformity Clause, explaining "[a] pretended classification,

that is based solely on a difference in quantity of precisely the same kind of property, is necessarily unjust, arbitrary, and illegal." *Id.* at 81. The basic principle announced in *Cope's Estate*—that "[t]he money value of any given kind of property . . . can never be made a legal basis of subdivision or classification for the purpose of imposing unequal burdens on [similarly situated] classes" (*id.* at 82)—remains good law by virtue of constitutional mandate.

The gist of Respondents' position is that the only non-uniform parts of the supplemental assessment scheme are the mandatory distributions and discretionary grants, which are not taxes at all and therefore cannot possibly violate the Uniformity Clause. While there is some superficial appeal to that argument, the history of the Uniformity Clause and this Court's early decisions on the subject both counsel otherwise.

As this Court has explained in prior cases, the Uniformity Clause was first adopted in the late nineteenth century, when the electorate ratified the so-called "Reform Constitution" of 1874. *Nextel Communications of Mid-Atlantic, Inc. v. Pa. Dep't. of Revenue*, 171 A.3d 682, 694 (Pa. 2017). That charter, which was "drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations," was intended to eliminate the legislature's authority to enact certain categories of "improvident and corrupt legislation." *Mount Airy #1, LLC v. Pa. Dep't. of Revenue*, 154 A.3d 268, 273 (Pa. 2016) (quoting ROSALIND L. BRANNING, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 37 (1960)).

The Uniformity Cause in particular embodied a populist backlash against the preferential tax treatment that the legislature often had extended to favored industries and individuals. *Id.* (citing ROBERT E. WOODSIDE, PENNSYLVANIA CONSTITUTIONAL LAW 576 (1985)). As a result of those preferential laws, "[t]he burden of maintaining the state had been, in repeated instances, lifted from the shoulders of favored classes, and thrown upon

the remainder of the community." *Fox's Appeal*, 112 Pa. 337, 4 A. 149, 153 (Pa. 1886). "The Uniformity Clause was, thus, the specific remedy fashioned by the delegates to that convention to eliminate the power of the legislature to enact special tax legislation, and its paramount purpose in requiring uniformity of taxation was to prevent certain groups from having to shoulder the burden of progress from which all would benefit." *Nextel*, 171 A.3d at 695.

Respondents here ask the Court to draw a bright line between the imposition of a tax and the spending of that tax's proceeds. While that may be a workable rule in many cases, ignoring the practical effect of the Gaming Act's collection-and-distribution scheme would require that the Court retreat from the core promise of the Uniformity Clause. Upholding an inequitable distribution scheme like the one at issue here would allow the General Assembly to circumvent the Uniformity Clause at will through artful statutory draftsmanship. Instead of imposing an unconstitutional graduated-rate tax, the General Assembly simply could impose a uniform tax on everyone and then later refund all or part of the taxes paid by a chosen few. It could, for example, tax all earned income on April 15 and then, on April 16, give a full refund to anyone making more than $500,000. The effect of this would be to tax disfavored taxpayers at a higher rate, while still maintaining the mere appearance of uniformity.

This case can be resolved by applying well-established Uniformity Clause principles.[15] If the Uniformity Clause is to mean anything, it must prohibit the discriminatory refunding of a tax in the same way that it prohibits the discriminatory imposition of a tax. To hold otherwise would be to ignore the practical effect of a given

---

[15] Rather than coming to grips with my analysis, the Majority simply dismisses it as "novel," *see* Maj. Op. at 15 n.9, as if "novelty" itself suffices to undo my reasoning. But this leapfrogs the issue before us. The reason that this Court has never struck down a "restricted-use distribution" scheme is simple: the General Assembly has never tried it before.

tax scheme while instead focusing on trivial labels like "credit," "deduction," "refund," or "distribution." This Court repeatedly has held that the validity of tax legislation does not hinge on the General Assembly's chosen jargon; reviewing courts instead must consider how the tax operates in practice. *See, e.g.*, *Nextel*, 171 A.3d at 698 ("In determining whether this statute violates the Uniformity Clause, we do not look at its language in a vacuum[.]"); *Shelly Funeral Home*, 57 A.3d at 1141 ("When assessing the validity of tax legislation, the nomenclature employed by the General Assembly is not necessarily dispositive, as our analysis considers how the tax operates in practice."); *Clifton*, 969 A.2d at 1211 ("When a method or formula for computing a tax will, in its operation or effect, produce arbitrary, unjust, or unreasonably discriminatory results, the uniformity requirement is violated.").

Under the Gaming Act's collection-and-distribution scheme, a Category 1 or Category 2 casino with GTR of less than $200 million will have its entire supplemental assessment offset by a refund from the very same account into which the assessment was deposited. The same is true for Category 3 casinos with GTR of less than $50 million. In fact, any casino receiving a mandatory distribution effectively would pay a negative-rate supplemental daily assessment, since the mandatory distribution would exceed the casino's assessment liability. This arrangement is irreconcilable with our Uniformity Clause jurisprudence, which instructs that every member of a particular class must be obligated to pay every applicable tax, and requires that "[p]art of the class may not be excused, regardless of the motive behind the action."[16] *Saulsbury*, 196 A.2d at 666.

---

[16] The fact that CMCD disbursements must be used for marketing or capital development purposes does not alter my conclusion that the overall disbursement scheme violates the Uniformity Clause. In truth, Act 42 imposes only minor restrictions on how licensees can spend CMCD funds. The Act does not define the term "marketing," and the definition of "capital development" is broad and open-ended. *See* 4 Pa.C.S. § 1407.1(g) (providing that "'capital development' shall include, but not be limited to,

**V.**

Although I conclude that the Gaming Act's collection-and-distribution scheme violates the Uniformity Clause of the Pennsylvania Constitution, and although I would not reach Sands' ancillary claims,[17] I nevertheless agree with the Majority that Subsections 1407(c.1), 1407.1, and 1408(c.1) of the Act are severable from the remainder of the statute and must be stricken.[18] I also agree that the remainder of the Gaming Act is

expansion or renovation of an existing licensed facility or constructing or expanding amenities at a licensed facility"). Plus, it is no secret that substantial marketing and promotional expenditures, including traditional advertising, sponsorships, loyalty programs, and player incentives, are an inherent part of the casino business. This means that Act 42 gives some licensees funds that can be used for the kinds of expenses that a licensee would incur even if it received no CMCD funds at all. A distribution-receiving licensee can simply replace its existing marketing budget with the CMCD distribution, thus freeing up an equal amount of cash on its balance sheet that can be used for any purpose.

If that minimal restriction is enough to satisfy the constitutional mandate that all taxes shall be uniform, then nothing would stop the General Assembly from enacting a tax scheme that gives a preferred group of individual taxpayers $5,000 "distributions" at the end of each tax year, provided that those taxpayers are required to spend the distributions on food, clothing, or shelter. Because this is precisely the evil that the Uniformity Clause sought to eradicate, *see Mount Airy*, 154 A.3d at 273, I have little difficulty rejecting the fiction that tax benefits fall outside the scope of the Uniformity Clause whenever their use is nominally restricted.

[17] Although the Majority (Maj. Op. at 15 n.9) takes me to task for my characterization of Sands' other arguments, and while I certainly acknowledge that Sands' complaint includes a Fourteenth Amendment challenge, the fact remains that Sands has treated that claim as a distinctly subsidiary issue throughout this litigation. For example, the section of Sands' brief arguing that the CMCD tax scheme violates the Fourteenth Amendment is only three pages in length (if one rounds up) and comes last among Sands' constitutional arguments. *See* Brief for Sands at 34-36. Similarly, counsel for Sands devoted his entire oral argument to the Uniformity Clause question. And while counsel for Intervenor (Greenwood Gaming and Entertainment) did invoke *Monzo*'s ramshackle benefits-versus-burdens discourse, he offered it as evidence that the CMCD collection-and-distribution scheme violates the Special Laws Clause of the Pennsylvania Constitution (not, as today's Majority holds, the Fourteenth Amendment).

[18] *See* 4 Pa.C.S. § 1407(c.1) ("[E]ach licensed gaming entity, other than a Category 4 slot machine licensee, shall pay a supplemental daily assessment of 0.5% of its gross terminal revenue to the Casino Marketing and Capital Development Account."); *id.* at

capable of execution after the above-mentioned provisions are excised. Indeed, the Gaming Act existed without those sections prior to Act 42, and the entire supplemental daily assessment scheme was designed to expire within a maximum of ten years after its enactment. *See* 4 Pa.C.S. § 1407.1(f)(2) ("This section shall expire on the earlier of ten years after the effective date of this subsection; or when the gross terminal revenue for each Category 1 and Category 2 slot machine licensee for the previous fiscal year exceeds $200,000,000"); *id.* at 1407(c.1)(2) (same); *id.* at 1408(c.1)(2) (same).

Finally, I agree with the Majority that Sands, Greenwood, and other similarly situated casinos are entitled to a refund of the amounts that they already have paid into the CMCD Account. While decisions invalidating tax statutes generally should not be applied retroactively,[19] I am persuaded that a different conclusion is warranted here because it is the *distribution* (rather than the collection) of the tax that renders the scheme unconstitutional. Furthermore, and as the Majority notes, Respondents have agreed to secure refunds for all affected casinos if the statute is struck down. I see no reason to disturb the parties' agreement.

In sum, I would hold that the Gaming Act's CMCD collection-and-distribution scheme violates the Uniformity Clause of the Pennsylvania Constitution. Although I would not reach Sands' Fourteenth Amendment arguments, I agree with the Majority that the challenged provisions cannot stand and that affected casinos are entitled to a refund.

Justice Mundy joins sections I, III, IV, and V of this concurring opinion.

---

§ 1407.1 (creating the CMCD Account, setting forth eligibility criteria for mandatory distributions, and instructing the Board to establish guidelines for awarding discretionary grants); *id.* at § 1408(c.1) (providing that $2 million shall be transferred from the State Gaming Fund to the CMCD Account at the end of each fiscal year).

[19]     *Oz Gas, Ltd. v. Warren Area Sch. Dist.*, 938 A.2d 274, 285 (Pa. 2007) (explaining that "a decision of this Court invalidating a tax statute takes effect as of the date of the decision and is not to be applied retroactively").